SANCHE

*v.*

THE ELECTROLIBRATION COMPANY.

EQUITY PLEADING AND PRACTICE; DEMURRER; NECESSARY PARTIES; SPECIFIC PERFORMANCE; ESTOPPEL.

1. While a defendant in equity cannot, in general, after he has answered the original bill, put in a general demurrer to the amended bill, he can do so if the nature of the case made by the original bill has been changed by the amendment.
2. Only such persons are necessary parties to a suit in equity whose rights would be affected by the decree, and in determining on demurrer whether or not certain persons named in the bill are necessary parties, the statements of the bill must be taken to be true.
3. Where an agreement between three parties provided among other things for the organization of a corporation to handle certain prospective patents of which one of the parties was the inventor, and for the assignment of such patents when granted to the proposed corporation, a bill in equity will lie, after the agreement has been partially executed, against the inventor, to enjoin him from manufacturing the devices patented as contemplated by the agreement, and for an accounting and assignment of the patents, even though the agreement while still executory was too vague and uncertain to be then enforced, and was in part a contract for personal services such as a court of equity will not enforce.

4. If a bill in equity can be maintained on some grounds and not on others, a demurrer to the whole bill will not be sustained.

5. A person is estopped to repudiate a contract of which he is a party, where the other parties to it have been induced by his action and conduct to expend money in carrying out the agreement and benefiting him as well as themselves.

No. 346.   Submitted October 18, 1894.   Decided November 6, 1894.

HEARING on an appeal by the defendant from an inter-locutory order (leave first having been obtained) overruling a demurrer to a bill of complaint.   *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an interlocutory appeal, allowed by special order of this court, from an order of the Supreme Court of the District of Columbia overruling a demurrer to a bill in equity.

The appellant, Hercules Sanche, a physician of Port Gibson, in the State of Mississippi, claimed to have " discovered a new means of preventing and curing diseases of human beings, animals, and plants," for which he applied for letters patent of the United States for the avowed purpose of exploiting his alleged discovery, procuring letters patent both in the United States and in foreign countries, manufacturing and selling the instruments and devices relating to the alleged new means; and for the purpose of pushing investigation in regard to its further development, he entered into an arrangement with three persons whom he had succeeded in impressing with a belief in the practical importance of his alleged discovery; namely, John N. Webb, of Birmingham, Ala., and Timothy Moroney and Cornelius Doremus, of New Orleans, La.; and he agreed with these men for the formation of a joint stock company, to which his patents, present and prospective, should be transferred in consideration of a certain number of shares of the capital stock to be transferred to him.   The memorandum of contract between the parties is of a very peculiar character; and as it is the

basis of the present proceedings, we transcribe it here in full. It is as follows:

"Whereas I, Hercules Sanche, M. D., of Port Gibson, county of Claiborne, State of Mississippi, having discovered a new means of preventing and curing diseases of human beings, animals, and plants, for which I have applied for letters patent in the United States; and

"Whereas it is desirable to form a stock company to patent in this and foreign countries and manufacture and sell the instruments and devices relating to said new means, and to push investigation to its further development:

"Now, therefore, in consideration of the premises and for the further consideration of twenty-five (25) per centum of the capital stock of said company, I hereby transfer all my right, title, and interest in and to all my patents, pending and to be applied for; all manuscripts and drawings relating to said new means; and for the further consideration of twelve and a half (12½) per centum of the net income from the operations of said company I bind myself, heirs and executors, to transfer to John N. Webb, Birmingham, Ala.; Timothy Moroney, New Orleans, La., and Cornelius Doremus, New Orleans, La., as trustees for this proposed company, and to devote my time and attention to the investigation and improvement of said discovery; and for the further consideration of two thousand dollars ($2,000), to be paid to me during the first year and annually thereafter until the said company pays a dividend of thirty per centum per annum, and thence such sum as the board of directors may deem proper, not exceeding five thousand dollars per annum. This assignment is conditional upon the opinion of Munn & Co. as to the patentability of said new means. A favorable report from the said Munn & Co. shall be followed by an organization of a company within sixty days from the date of the receipt of said Munn & Co's report. The capital stock of said company shall be sufficient to secure and operate all desirable patents in this and other countries.

"In testimony whereof I have hereunto set my hand and affixed my seal this 14th day of July, A. D. 1887.

(Signed)   "Hercules Sanche, M. D.

"Witness, in the presence of—

"Isaac Gillespie.

"Ferdinand Johnson."

The new means for treating disease which Sanche claims to have discovered seem to have been two-fold: 1st. A connection of the body with the earth by means of conductors; 2d. A connection of the body with sources of heat and cold.

In accordance with the understanding between the parties, the opinion of Munn & Company, who are patent attorneys, was applied for; and they reported that neither invention was new, and that there were existing patents, English and American, that covered both of the claims. In reference to the first claim they say: "In view of the above references, it is obvious that no broad claim for treating diseases by connecting the body with the earth by means of conductors can be obtained. A patent may be obtained for the particular construction of the apparatus used by you if the Patent Office examiner can be convinced that it will produce beneficial results." And with reference to the other claim, they say: "These references show metallic and other conductors for applying heat and cold to the body in cases of disease, and would prevent any broad claim being granted for this purpose. We think, however, that a patent for your special construction of apparatus may be obtained, if it can be shown to the satisfaction of the Patent Office examiner that beneficial results are attained by their use. In making an application for a patent, the usual risks will have to be incurred; viz., the existence of a caveat or of a pending application in the secret archives of the Patent Office, or the discovery of a similar foreign invention, or the possible finding of a more closely resembling American patent than we have cited."

Strange as it may seem, this report from Munn & Co.

would appear to have been regarded by the parties as favorable; and steps were thereupon taken to organize the projected company. Funds were sought to be raised, and subscriptions were procured to the capital stock of this company. There were some peculiar features in connection with these proceedings, which it is not important here to notice. The company was formed under the name of "The Electrolibration Company," or "The Electrolibration Company, of Birmingham, Alabama," under the laws of the State of Alabama, as it was assumed—although it would appear from the sequel that the laws of Alabama had not been complied with in its organization, and that there was in fact no legal incorporation. The letters of incorporation were issued on October 8, 1887. But, apparently, without waiting for the issue of these letters, Webb, Moroney, and Doremus, the promotors of the enterprise and the persons named as trustees in the memorandum of agreement made by Sanche on July 14, 1887, conveyed and transferred to the new company, assumed to be already in existence, all the rights vested in them by Sanche by virtue of that agreement; with a proviso, that if there should occur a dissolution of the company, and a sale of its assets, the sale should reserve to Sanche his one-fourth interest, and the purchaser should be liable to him to the same extent as the company.

Sanche participated in the organization of the company, apparently received his share of the stock, accepted employment with the company in accordance with the agreement of July 14, and so continued for a period of two years thereafter, receiving during that time compensation for his services. The company supplied the funds for the prosecution of the application for letters patent then pending, which was for the appliance for the connection of the body with the earth by means of conductors; and it also paid all the expenses incident to the application for letters patent for the other device that has been mentioned, that of connecting the body with sources of heat and cold, which application

was made on October 27, 1887. It also paid all the personal expenses of Sanche while he was engaged in the prosecution of these claims.

Subsequently, however, dissensions arose between the parties—from what cause does not clearly appear; and Sanche set up for himself, regardless of the company, and proceeded to manufacture and sell for his own account the appliances which it was presumed he had assigned and transferred to the company; and in so doing, he also used the trademark, consisting of the word "Electropoise," which, it is said, he had invented for the use of the company, and to designate the articles belonging to it under their agreement. Thereupon the company instituted the present suit.

In the amended bill the complainant company, after alleging the fact of its being a body corporate duly organized under the laws of the State of Alabama, proceeds to set forth substantially the facts hereinbefore stated. Referring to the alleged discoveries or inventions of Sanche and the paper writing of July 14, 1887, the company says that in pursuance of the opinion of Munn & Co., heretofore mentioned, which was deemed favorable, the organization was formed within sixty days thereafter; and the trustees, Webb, Moroney, and Doremus, in pursuance of the provisions of the paper of July 14, did, on October 6, 1887, convey and transfer to the company thus formed all the right, title, and interest of Sanche that had been vested in them by that instrument, and all patents pending and to be applied for, and all manuscripts and drawings relating to the invention or discovery. And this deed of conveyance, as well as the paper writing of July 14, was filed in the United States Patent Office on November 7, 1889.

It is further alleged that Sanche participated in the organization of the company, was a subscriber to its capital stock, accepted employment with it and received compensation for his services in accordance with the provisions of the paper of July 14; that, in pursuance of his suggestions, the

company adopted the name "Electropoise" as a trademark for its appliances, and caused that trademark to be registered in the Patent Office; that it has continuously used such trademark in connection with these appliances; and that it has expended large sums of money in the promotion of the invention or discovery.

By virtue of some understanding between the parties, one-half of the whole capital stock was to remain in the treasury of the company, to be disposed of for its benefit; and when the certificates of stock, which were not issued until about May, 1890, were sent to Sanche, who had then changed his residence to the city of Detroit, in the State of Michigan, there were thirteen certificates, aggregating 1250 shares of stock, which was one-half of the 25 per centum of stock provided to be given him by the paper of July 14. The dissension between the parties, however, it seems, had then arisen; and Sanche declined to receive the certificates, and returned them to the company.

It is further alleged that from and after August 1, 1889, Sanche declined to act with or for the company, and proceeded to manufacture and sell for his own benefit the appliances which he had contracted to transfer to the company; and that he has interfered with the efforts of the company to procure a patent on the application made in 1887. This application having been made after the paper writing of July 14, 1887, was executed, the Patent Office, it seems, did not regard it as having been assigned by that paper, and declined to recognize the company in the matter without a further assignment.

In this amended bill, the company claims to be entitled, under the paper of July 14, and the subsequent assignment to it by the trustees, to all the inventions and discoveries, present and prospective, of Sanche, relating to this new means of curing disease, or designed to make it more efficacious. And the prayer of the bill is for an injunction to restrain Sanche from claiming title in himself to the device,

and from selling or manufacturing the appliances; and for a decree requiring him to transfer to the company the patents already procured by him, and to assign to it the application made in 1887. The bill also prayed for an accounting.

It seems that there was another suit in equity pending about the same time between the same parties with reference mainly, if not exclusively, to the trademark matter, and that it is yet pending in the court below; and that in that suit an injunction *pendente lite* was issued, which is yet in force.

The defendant Sanche demurred to the amended bill, assigning as grounds for the demurrer that Webb, Moroney and Doremus should have been made parties to the suit; and that no case for equitable relief was stated in the bill. This demurrer was overruled by the court below; and from the order overruling it a special appeal was allowed to this court.

*Mr. Henry E. Davis, Mr. J. J. Darlington* and *Mr. A. S. Worthington* for the appellant.

*Mr. R. G. Dyrenforth* and *Mr. A. A. Hoehling, Jr., (Mr. J. M. Wilson* of counsel) for the appellee.

Mr. Justice MORRIS delivered the opinion of the Court:

It is urged as a preliminary question by the appellee, that the appellant, having answered the original bill, cannot be allowed to demur to the amended bill. It is claimed that the amended bill is substantially the same as the original bill; and that, after answering, the defendant has not the right, under the rules of pleading in equity, to demur. And in this connection, Daniell's Chancery Pleading and Practice, Vol. 1, page 468, is cited, as follows:

"An amendment of the bill, however, does not necessarily enable a defendant to demur to a bill which he had previously answered, upon any cause of demurrer to which the original bill was open, unless the nature of the case made by the bill has been changed by the amendment." And also,

the same author, Vol. 1, page 583 : "A defendant in general, after he has answered the original bill, cannot put in a general demurrer to the amended bill, because the answer to the original bill, being still in the record, will in fact over-rule the demurrer."

But in this case, it may well be held that "the nature of the case made by the original bill has been changed by the amendments." Without attempting to go into any compari-son of the two bills, it is quite apparent that in his answer to the original bill the defendant denied the legal existence of the complainant as a corporation under the laws of the State of Alabama; and that between the date of the filing of that answer and the time of the filing of the amended bill such proceedings were had in Alabama as to induce the de-fendant to abandon that charge, and now to admit, as he is assumed to do by his demurrer, the valid and legal exist-ence of the corporation. This is such a radical change of conditions as substantially to make the amended bill a dif-ferent one from the original, and entitling the defendant to interpose a new defense.

1. The first ground of objection to the bill is that it shows upon its face that there are not proper parties to the suit; and that Webb, Moroney and Doremus, with whom the con-tract of July 14, 1887, was made, are necessary parties to this proceeding.

The position of these three persons in the transaction was, first, that of promoters of the enterprise; and, secondly, that of trustees or stakeholders to receive the property and rights which the appellant sought to exploit, and to transfer them to the proposed company as soon as it should be formed. When the company was organized, and when they had exe-cuted to that company a conveyance in due form, of the rights that had been vested in them for that sole purpose, their duty was fully performed, and their functions were absolutely at an end.   There was nothing thereafter

to be done by them; nothing which they could rightfully be required to do either by the parties or by a court of equity. Now, it is a well established rule of equity procedure that only such persons are necessary parties to a suit whose rights would necessarily be affected by the decree. *Kerr* v. *Watts*, 6 Wheat. 550; *McArthur* v. *Scott*, 113 U. S. 340; Story's Eq. Pl., Sec. 231, and cases cited in the notes; Daniell's Ch. Pl. and Prac., page 342.

If, by the proof in the case, or by further developments, it should appear that the trustees had never really conveyed the interest that was vested in them, or that the conveyance by them to the company was in any manner tainted with fraud, and that, therefore, there was yet some interest, legal or equitable, remaining in them, in respect of which they should be made parties to the suit, that *is* a risk which the complainant takes, and which does not seem to affect the defendant in any way. For, in that event, the complainant could have no relief until the proper parties were made. But when the bill states that these three trustees have fully performed the trust reposed in them, and therefore have no longer any right, title, or interest, legal or equitable, that could be affected by the decree—and for the present hearing, of course, these statements of the bill must be taken as true—it is not apparent to us that there is any necessity, or even propriety, in bringing them into the suit as parties.

2. More reliance is evidently placed by the appellant upon the second ground of demurrer than upon the first, and it is more worthy of earnest consideration. The argument is that the bill is one for specific performance of the contract of July 14, 1887; and that this contract is incapable of specific performance, inasmuch as it is too vague and uncertain to be enforced, wanting in mutuality, and is a contract mainly for personal services such as a court of equity cannot and will not enforce.

We think that it is a misapprehension on the part of counsel to assume that the bill in this case is one for the

specific performance of the contract of July 14, 1887; or, at least, that it is exclusively such. That contract, of course, is the basis of all the proceedings; but it is not all that there is in the case; and specific performance of it is not all that is sought by the bill of complaint.

The paper writing of July 14, 1887, signed by Dr. Hercules Sanche, the defendant in this case, is a remarkable document, evidently the production of a person whose knowledge of legal forms was only sufficient to induce the more easy commission by him of legal blunders; and we have no disposition to find fault with the censures passed upon its ungrammatical clumsiness and its literary demerits by the counsel for the appellant, inasmuch as the clumsiness and the demerits must be charged mainly, if not exclusively, to the account of the appellant himself. If the contract sought to be set forth in that paper writing had remained wholly executory, it is difficult to see how specific performance of it could be enforced by a court of equity at the suit of any person or for any purpose whatever. It would probably be impossible for a court of equity to determine where or how a joint stock company should be organized with " a capital stock sufficient to secure and operate all desirable patents in this and other countries." It would certainly be difficult for a court of equity, from a perusal of the reports from Munn & Co., contained in this record, to bring itself to the conclusion that the condition precedent for the organization of a company, a favorable report from that firm upon the patentability of " the new means," had actually supervened. And most assuredly a court of equity would not assume to enforce the undertaktaking of Dr. Sanche " to devote his time and attention to the investigation and improvement of said discovery."

But that contract is no longer wholly executory. It has been freed by the action of the parties themselves from some, if not all, of its infirmities of indefiniteness. The parties have settled for themselves the question of a favorable report

from Munn & Co., as well as the question of the patentability of the invention or discovery, so far as that can be settled by their action. They have organized the company; they have fixed the amount of its capital stock; and the capital stock, so far as deemed necessary, seems to have been subscribed for. The 25 per centum of that stock, stipulated to be assigned to the appellant, has been assigned to him, subject it is true, to some subsequent arrangement by which one-half of it was to be left in the treasury of the company for further disposition—an arrangement in which the appellant acquiesced, according to the statements of the bill. The company entered upon the work which it was created to perform ; it spent its money and expended its efforts in the promotion of the schemes of the appellant; and the appellant participated in its organization, subscribed to its stock, took employment under it and received compensation from it in pursuance of his contract. In pursuance of that contract, also, the trustees therein named, immediately upon the organization of the company, conveyed to it, apparently with the full knowledge and concurrence of the appellant, all the right, title and interest which the latter had transferred to them by that contract. The contract, therefore, has been in great part executed ; and all those parts of it, except the undertaking for the personal services of the appellant, have been actually performed, and there is no longer any question of them.

But about the month of August, 1889, upwards of two years after the execution of this contract, when the company had been in operation nearly two years, dissensions arose, and Sanche refused thereafter to co-operate with the company or to act in its interest. On the contrary, he sought to repudiate its obligations, to manufacture and sell the appliances of the new discovery for his own exclusive use and benefit without regard to the company, to use for that purpose the trademark " Electropoise " which the company had adopted and caused to be registered, and to refuse to assign to the company the applications for patents then pending in

the Patent Office. This action or conduct of his it is, and not merely the contract of July 14, 1887, which the amended bill of complaint in this case seeks to reach by injunction to restrain his proceedings as an infringement of their rights, by an accounting for the profits made by him through such infringement, and by specific performance of the contract of July 14, 1887, only in so far as that contract provided for the assignment to the company of all patents relating to the discovery that might be applied for subsequently to that date. It may possibly be that, under a proper construction of the contract, the company may not be found to be entitled to the benefit of any subsequent applications for patents, notwithstanding that its terms seem to be amply broad enough and sufficient to cover such applications. But, under the showing made by the bill of complaint, the company is certainly entitled to the benefit of the application made previously to that date, and to any and all patents and patent rights based thereon; and if that showing is sustained by adequate proof, the complainant will be entitled to the injunction and accounting which it prays, regardless of its claim of right to the benefit of any other applications. And if the bill can be maintained on that ground and for that purpose, it necessarily follows that a demurrer to the whole bill for want of equity cannot be sustained, and was properly overruled. We may add that we see nothing from which to dissent in the opinion pronounced upon the subject by the learned justice who held the court below.

3. It is further argued on behalf of the appellant, that the only application for patent pending on July 14, 1887, was one relating to the appliance for contact of the body with the earth; that the bill seeks relief only with reference to the class of inventions relating to the connection of the body with hot or cold objects; and that therefore the complainant has no standing in court. This conclusion would not follow, except in the event that it would appear that no right was conveyed to the company to any application

4 Ct. App.—30

made after the date of the contract—a question upon which we have not found it necessary here to express any opinion. But the conclusion fails absolutely by the erroneous assumption in the statement that the bill seeks relief only as to the class of inventions relating to the connection of the body with hot or cold objects.

The second prayer of the bill in general terms, and the third prayer in express terms, seeks relief as to both classes of inventions; and the statements in the body comprehend both.

The interests involved in this suit are evidently valuable, in the opinion of the parties. Upon the faith of a contract supposed to be valid and binding, and which we may justly presume was drawn by the appellant himself, the appellee was brought into existence, was made the recipient of rights supposed to be valuable, and was induced by the action and conduct of the appellant to expend money upon the furtherance of those rights and for the benefit of the appellant as well as of the others in interest. It is not equitable now to permit the appellant to repudiate the whole transaction. We think he should be estopped from so doing; and we think all doubts and difficulties, at this stage of the proceedings, should be solved against him. As we have intimated, further developments in the cause may show that the complainant has no just rights in the premises for the protection of which it is entitled to appeal to a court of equity. But this we cannot anticipate, if such should be the result. The bill, in our opinion, makes out a *prima facie* case for the intervention of a court of equity; and this is all that we can now determine.

We are of opinion that the court below was right in its decision; and *we, therefore, affirm, with costs, the order of that court overruling the defendant's demurrer, and we remand the cause to that court for further proceedings according to law.*