**ARLINGTON TOWERS LAND CORPORATION et al., Plaintiffs,**

v.

**JOHN McSHAIN, Inc., et al., Defendants.**

Civ. A. Nos. 2797-55, 1072-56.

United States District Court
District of Columbia.

Feb. 26, 1957.

Judgment Filed April 3, 1957.

Ellis Lyons (of Perlman, Baldridge, Lyons & Browning), Washington, D. C., Milton Gould and Alvin M. Stein (of Gallop Climenko & Gould), New York City, for plaintiffs.

Charles B. Murray, George Shea, Washington, D. C., for defendants.

TAMM, District Judge.

*Identity of the Parties.*

The plaintiff Arlington Towers Land Corporation is a Virginia corporation formed for the purpose of acquiring title to a tract of land consisting of some 18 acres located in northern Virginia, adjacent to the District of Columbia. It was incorporated on October 15, 1953. Plaintiffs First Arlington Towers Corporation, incorporated on November 15, 1953, Second Arlington Towers Corporation, incorporated on March 3, 1954, Third Arlington Towers Corporation, incorporated on December 23, 1953, and Fourth Arlington Towers Corporation, incorporated on October 4, 1953, are Virginia corporations individually organized for the erection and operation of apartment and commercial buildings upon the tract of land held by the Arlington Towers Land Corporation. All of the issued and outstanding stock of the building corporations is owned by the Land Corporation, while the preferred stock of the building corporations is, or was at the time of the filing of this suit, owned by the Federal Housing Administration. The plaintiffs, Walter P. McFarland, Edward Johnson and John Loughran, are the owners of all of the issued and outstanding stock of the Land Corporation. The plaintiff William J. Kress is, or was at the time of the filing of this action, the secretary of the Land Corporation.

The defendant John McShain, Inc. is a Delaware corporation engaged in the building and construction business. Defendant John McShain is the president and principal figure in John McShain, Inc. Defendant George F. Shea is an attorney in the District of Columbia who represented John McShain, Inc. as attorney during a part or all of the time

involved in the transactions which are the subject of this suit. The defendant, the Pennsylvania Company for Banking and Trusts, although named as a defendant in the action, was not served in this case.

*Factual Background Leading to These Proceedings.*

In 1949, the O'Driscoll Construction Corporation assembled several parcels of land which ultimately became the 18 acre tract acquired by the Arlington Towers Land Corporation. These parcels were assembled by the O'Driscoll corporation to enable it to construct the apartment development known as the Arlington Towers project. The O'Driscoll Corporation took various steps in the interest of this development which led to the filing of applications for insured mortgages with the Federal Housing Administration in 1951. The O'Driscoll group attempted to secure from the Federal Housing Administration insured mortgages which would permit the construction of the project under section 608 of the National Housing Act, 12 U. S.C.A. § 1743.

In the fall of 1951, the O'Driscoll group abandoned the Arlington Towers project because they were unable to arrange the financing necessary to the project and financing required by the Federal Housing Administration. Because of their accumulated investment in the project, the O'Driscoll group attempted unsuccessfully to sell the project, and in the course of these efforts attempted unsuccessfully to interest the McShain corporation in the project.

In the summer of 1952, Mr. Paul Hauck, General Superintendent for the McShain corporation in the Washington area, talked to the plaintiff Walter P. McFarland about the Arlington Towers project, told him some of the background of the project, and suggested that McFarland attempt to interest some friends in undertaking the financing of the project which McShain might then build. McFarland, thereafter, consulted the architects who had designed the project

for O'Driscoll, consulted the Federal Housing Administration, and initiated a long course of activities which ultimately resulted in the financing of the project. In order to assist in perfecting the financing arrangements, the McShain corporation through John McShain furnished McFarland with letters indicating that McShain had an agreement with McFarland to build the project for $18,-000,000. McShain agreed further to take other steps, discussed in more detail hereafter, to assist McFarland in acquiring the land from the O'Driscoll group, in securing the necessary financing, and guaranteeing the completion of the project. The negotiations, studies and planning for the project extended from the summer of 1952—probably the latter part of June of that year—until December 17 or 18, 1953, at which time a contract was executed between the Arlington Towers Land Corporation and John McShain, Inc. A copy of this contract is attached hereto and identified as Court Exhibit No. 1. It was supplemented by a letter dated December 21, 1953, also attached hereto and identified as Court Exhibit No. 2, and a further agreement dated December 18, 1953, copy of which is attached hereto and identified as Court Exhibit No. 3.

As a result of the execution of the contract of December 18, 1953, the Federal Housing Administration issued final commitments for insured mortgages covering the construction of Arlington Towers units Four, Three and One. The Chemical Bank and Trust Company of New York issued "Over and Above Loan" commitments, the Teachers Insurance and Annuity Association of New York made commitments covering advances on a mortgage covering the ground involved in the project, and other formalities being completed, the McShain corporation undertook the construction of the buildings embraced in these three contracts.

Some delay occurred in the completion of the formalities relating to the construction of that segment of the project embraced in the agreements relating to Second Arlington Towers Corporation,

the reasons for the delay being one of the contested points in the case.

The McShain group collaterally contended that a commercial building identified hereafter as commercial building "C" was not embraced in the Master Contract, or other agreements, between the parties. The plaintiff McFarland contends now that in the elimination of commercial building "C" he understood that he was to receive credit from McShain for the cost of the building. Commercial building "C" was not built, and its status in the agreements and understandings between the parties is one of the principal issues in the case. Ultimately, the plaintiff McFarland and the plaintiffs, Edward Johnson and John Loughran, executed a further document dated April 28, 1954, which document was also executed by McShain, and which related to the construction of the Second Arlington Towers unit. A copy of this document is attached to this opinion and is identified as Court Exhibit No. 4. Thereafter, the Federal Housing Administration financing and other financing having been completed, the McShain Company undertook the building of the Second Arlington Towers unit with commercial building "C" eliminated.

As the construction progressed, a series of disputes arose between the parties, which disputes insofar as they are pertinent to the case are identified hereafter and are treated individually. In general terms, these disputes related to the addition to or deletion from the buildings of items referred to in the basic plans and specifications; to the alleged failure of the workmanship and materials to meet the standards required by the plans and specifications; to delay in the completion of First Arlington Towers; to failure of McShain to complete the units within the time required by the agreements; to the failure of McShain to correct defective work enumerated in a series of "Punch Lists" drawn up by the plaintiffs, and to refusal on the part of McShain to pay certain sums growing out of mortgage discounts.

After the present suit was filed, the parties selected an Arbitrator to determine the reasonable value of the additions and deletions; and upon the filing of the arbitration award, the plaintiffs moved to set the award aside on various grounds.

In the meanwhile, the defendants had filed, on November 28, 1955, in the Eastern District of Virginia, an action seeking to recover the sum of $275,000 represented by a note made by the Land Corporation on April 29, 1954. This action was transferred from the Eastern District of Virginia and consolidated with the present case for the purpose of trial.

During the course of the present trial, the Court, over defendants' objections, permitted the plaintiffs to amend their complaint by adding thereto a claim against the defendant McShain in the amount of $154,439.71 representing an assignment to the plaintiffs of a balance due by McShain to E. C. Ernst, Inc. for electrical work installed by that corporation in the Arlington Towers project.

*Contentions of Parties in the Present Suit.*

The plaintiffs filed this action on June 25, 1955.

The issues to be determined by the Court, as agreed to by counsel in a pre-trial order filed on November 15, 1956, are as follows:

1. Have the four Federal Housing Administration projects been completed?

2. Was the Supplemental Agreement of April 28, 1954 valid, or is it void by reason of threats and coercion in its procurement, and lack of consideration?

3. Is the award of the Arbitrator allowing the Land Corporation net credit for changes made during construction to be vacated or modified, and are plaintiffs entitled to additional credit for incomplete work?

4. Is McShain liable as guarantor for the payment of financing fees in connection with the permanent mortgages of the building corporations?

5. Are plaintiffs entitled to set-off, or credit, for the nonconstruction of "C" building?

6. Are plaintiffs entitled to additional credit for incomplete work?

7. Do plaintiffs come into Court with unclean hands which disqualify them from equitable relief?

8. Have plaintiffs defaulted in any of their obligations, and if so, what is the nature of such default in relation to the scope and applicability of the escrow powers given to defendant McShain? Or, have plaintiffs fulfilled their obligations which affect their rights in the escrow powers, and if so, to what extent?

9. Have any of the individual plaintiffs improperly received loans, advances, payments, free or reduced rentals, or other benefits from any plaintiff corporation, or have they subjected any plaintiff corporation to waste or mismanagement? Plaintiffs challenge the right of defendant to bring this issue into the case.

10. Could plaintiffs validly have the Land Corporation give its note dated approximately May 22, 1956 to the Chemical Corn Exchange Bank in the amount of $290,000; or has the Land Corporation given as collateral to this note other notes due it from the building corporations; or have all plaintiff corporations agreed that money due to the Land Corporation from the building corporations be paid directly by the building corporations to the Chemical Corn Exchange Bank on the $290,000 note? The plaintiffs again challenge the right of the defendants to bring this issue into the case.

11. Are plaintiffs obliged to reimburse McShain in the amount of $40,213.73 for obligations of plaintiffs which they requested McShain to pay for them?

12. Are plaintiffs entitled to damages in the sum of $200,000 for delay?

13. Are plaintiffs entitled to money damage by reason of McShain's failure to pay the $412,607.50 as mortgage points?

The plaintiffs request the following relief of the Court:

1. That it be adjudged and decreed that the only balance remaining to be paid to McShain under the Master Agreement is the sum of $70,571.47, payable three years after such date as the Court may declare to be the date of completion of the project.

2. That it be adjudged and decreed that the obligation of plaintiffs or any of them to pay McShain represented construction costs of $17 million is fully satisfied.

3. That it be adjudged and decreed that the common stock, minute books, seals and undated resignations of the officers and directors of plaintiff corporations are free and clear of any lien or encumbrance arising out of the obligation of plaintiffs or any of them to pay McShain represented construction costs of $17 million.

4. That plaintiff Land Corporation be ordered and directed to issue to McShain three year note in the sum of $412,607.50.

5. That defendant George F. Shea be ordered and directed to return to plaintiffs minute books, seals and undated resignations of the officers and directors of plaintiff corporations.

6. That defendant George F. Shea be ordered and directed to deliver to such escrowee as the Court may designate the common stock of plaintiff corporations to be retained by such escrowee only so long as the said three year note remains unpaid.

7. Plaintiffs further pray that the promissory note in the amount of $275,000 and the deed of trust referred to therein which are the subject of C.A. 1072–56 be cancelled, set aside and declared invalid.

The defendants request the following relief from the Court:

1. Plaintiffs be ordered to deliver to defendant George F. Shea, as Escrow Agent, all minutes and all corporate seals of each plaintiff corporation which have not heretofore been delivered to defendant George F. Shea.

2. Defendant George F. Shea be authorized to deliver to defendant John McShain, Inc., and defendant John McShain, Inc. be authorized to receive:

a. The certificates of stock endorsed in blank of all plaintiff corporations.

b. The undated resignations of the officers and directors of all plaintiff corporations.

c. The minutes and minute books of all plaintiff corporations.

d. All seals of all plaintiff corporations.

3. Defendant John McShain, Inc., its agents, employees and representatives be authorized forthwith to take over and manage the affairs of plaintiff corporations, pursuant to the terms of the contracts attached to and made a part of the Complaint, as Exhibits A, B, and C.

4. The officers, directors and stockholders of plaintiff corporations, and their agents, servants, employees, attorneys, representatives and all other persons that act in active concert or participation with them, be ordered forthwith:

a. To turn over to defendant John McShain, Inc. all records, books, documents, contracts and other assets of each plaintiff corporation and to perform whatever acts are necessary with banks and others to make possible the immediate management, control and the exercise of such other rights as exist under said Exhibits A, B and C, by defendant John McShain, Inc.

b. To be restrained from interfering with the management and control by defendant John McShain, Inc. of plaintiff corporations and the exercise of such other rights as exist under said Exhibits A, B and C; and

c. To be restrained from taking away, interfering with, disposing of, or secreting any assets of any of plaintiff corporations.

In the event the relief prayed for in the foregoing paragraphs 1–4 inclusive be not granted, then defendants pray for judgment;

5. Requiring the individual plaintiffs and plaintiff Arlington Towers Land Corporation to pay forthwith to defendant John McShain, Inc. the sum of $529,308.-50, with interest from February 2, 1956.

6. Requiring plaintiff, Arlington Towers Land Corporation, to pay forthwith to defendant John McShain, Inc. the sum of $580,518.73, with interest from February 2, 1956.

7. Requiring plaintiff Arlington Towers Land Corporation to deliver forthwith to defendant John McShain, Inc. a 36 month note in the amount of $1,000,-000, dated February 2, 1956, which note shall be payable in equal installments and shall contain the following provisions:

$166,666 payable seven months after date.

$166,666 payable one year after date.

$166,666 payable eighteen months after date.

$166,666 payable two years after date.

$166,666 payable thirty months after date.

$166,670 payable three years after date.

Interest shall begin to run at six percent (6%) when any installment is one (1) week past due.

8. Requiring plaintiff Arlington Towers Land Corporation to pay forthwith to defendant John McShain, Inc. on said 36 month note all principal sums due thereon from February 2, 1956 to the date of judgment, with interest from February 2, 1956.

9. Plaintiffs be ordered to deliver to defendant George F. Shea as Escrow Agent all minutes and all corporate seals of each plaintiff corporation which have not been delivered to defendant George F. Shea.

10. Defendant George F. Shea as an Escrow Agent, or such other person or party as defendant John McShain, Inc. may designate with this Court's approval be authorized to hold:

a. The certificates of stock of all plaintiff corporations.

b. The undated resignations of the officers and directors of all plaintiff corporations;

c. The minutes and minute books of all plaintiff corporations; and

d. The seals of all plaintiff corporations; all such items to be held by the Escrow Agent until such time as said 36 month note be fully paid, with interest if any; and when such payments be made, such Escrow Agent be authorized to deliver the items in a, b, c, and d above to plaintiff Arlington Towers Land Corporation.

In any event, defendants pray for judgment:

11. Requiring the individual plaintiffs forthwith to pay back to plaintiff corporations all improper loans, payments and advances which were received by them and further requiring such individual plaintiffs who have occupied any of the premises owned by plaintiff corporations to pay to the respective plaintiff corporations from the beginning of their respective occupancy, a rental commensurate with the rental value of the premises so occupied.

12. Requiring:

a. Plaintiff Arlington Towers Land Corporation to secure the cancellation of its note to the Chemical Corn Exchange Bank in the amount of $290,000 the cancellation of the assignment of collateral therefor, and the return of said documents to said corporation; and

b. The individual plaintiffs to reimburse the plaintiff corporations for any sums paid on said note and to pay to said bank the remaining balance due on said note.

13. Plaintiffs be ordered to pay to defendant John McShain, Inc. all costs, including reasonable attorneys' fees, in the case of John McShain, Inc. v. Arlington Towers Land Corporation, U.S.D.C., Ed. Va., C.A. 1260 (U.S.D.C.D.C., No. 1072–56).

14. Plaintiffs be ordered to pay to defendant John McShain, Inc. its costs.

15. Defendants have such other and further relief as to this Court seems just and proper in the premises.

Credibility of Witnesses.

▮ The Court, sitting without a jury in this case, is required in making its findings of facts to pass upon the credibility of all of the witnesses. There is substantial conflict upon material issues among the various witnesses. There are occasions when the testimony of a witness is at variance in greater or lesser degree with some of the documents in the case. The Court, in passing upon the credibility of the witnesses and documents, has placed substantial reliance upon documents, particularly those which were written at a time when the writers appeared to have no motive in mis-stating facts.

It is impossible to reconcile the oral testimony of some of the witnesses. The Court, accordingly, has placed great credibility upon these witnesses whose demeanor upon the stand, manner of testifying, and other factors, resulted in the conclusion that the probability of truth upon a particular issue favored an individual witness. It is to be observed that the testimony of the witness Walter McFarland differed substantially on individual points from the testimony of the witness William Russell. Similarly, McFarland's testimony is at variance with the testimony of the witnesses, McShain, Hauck, Barringer, Dean, McCarthy, Shea, Wright and other witnesses. The testimony of McFarland was at variance with affidavits executed by him and filed with the pleadings in the present case. Some variation in testimony is also to be noted between the testimony of the witness John McShain and of the witness William Russell and the depositions made by them.

The Court, in reaching its conclusions in the case, has taken into consideration all of the testimony in the case, together with all of the exhibits, and has afforded the testimony of each witness that degree of credibility which the Court felt was

proper in the light of the over-all impact of the witness and the exhibits upon the Court.

*The Controversy Regarding "C" Building.*

The plaintiffs claim that they are entitled to receive from McShain credit in the amount of $450,000 because commercial building "C" was not constructed. It is the position of the defendants that the "C" building was not a part of the ultimate agreement between the parties and that the sum agreed upon for the completion of the project did not include the cost of the "C" building, and that the plaintiffs are, accordingly, not entitled to any credit for this item.

There is no doubt but that the "C" building was a part of the O'Driscoll project or that the plans filed by O'Driscoll with the Federal Housing Administration contained some drawings relating to the "C" building. Defense counsel has, as a matter of fact, stipulated that the "C" building was in the project until August or September of 1953. There appears to be no doubt but that various people favored the deletion from the project of the "C" building. In the summer of 1953, Dean of the Federal Housing Administration discussed with plaintiff McFarland the question of whether the "C" building was economically feasible in the light of its potential mortgage value. Some time later, the witness Russell Hauser states he directed that the Federal Housing Administration Commitment be issued without the inclusion of the "C" building. The witness Russell testified that he eliminated the "C" building during the course of his studies to reduce the cost of the project. The cost of the project, as originally estimated for the McShain company by the now deceased Tippet, was $21,586,200. (Defendants' Exhibit No. 1). When Russell re-estimated the project in August or September of 1953, as indicated by Defendants' Exhibit No. 7, he arrived at an estimated cost of the project of $17,600,-000. He testified that he thereafter made efforts to further reduce the cost of the project and that the plaintiff McFarland knew that efforts were being made to reduce the cost of the job to the $17,000,000 figure which Mr. McShain had established for the project. In this regard, Russell testified that McFarland participated in conferences with himself and with Hauck concerning the necessity for bringing the price of the job down to the $17,000,000 figure by the cheapening or elimination of various items, and Russell testified at some length concerning the elimination of bowling alleys and skating rink and other items, and said that he advised McFarland, during this period, that "C" building had been eliminated from the estimates and that McFarland's instructions to him were, in effect, to eliminate anything that he, Russell, saw fit in order to get the cost of the project down to $17,000,000. Russell testified that he also told the witness Coates of the elimination of "C" building, although Coates denied having been advised of this fact at that time.

John McShain testified that the understanding between himself and McFarland was that the project, as it was finally undertaken, did not include "C" building.

There are hundreds of pages of testimony concerning conversations, conferences and exchanges of letters relating to the undertaking of the project and its financing in the period before the drawing of the Master Agreement, that is, December 18, 1953. It should be noted, in connection with the Master Agreement, that although there are references therein to drawings and specifications which are incorporated into the contract, these drawings and specifications, at least for the most part, were not even in existence when the Master Agreement was signed. There is, consequently, no positive documentation that establishes exactly what the parties had in mind on December 18, 1953 insofar as the "C" building is concerned. There is no doubt in the Court's mind, from the testimony, that concerted efforts were made by McShain prior to the execution of the Master Agreement to bring the estimated cost of the project down to the $17,000,000 figure. There is no doubt but that eliminations and

changes were made in order to reduce the several estimates to this $17,000,000.

Collaterally, it is to be observed that in the early stages of the negotiations between McFarland and McShain, McFarland stated that the Federal Housing Administration insured mortgages would total or even exceed $17,000,000. The testimony establishes that McFarland had difficulty in securing financing in sufficient quantity to meet his over-all costs. Architects' fees were incurred totaling some $200,000, due in substantial measure to the necessity for redesigning the apartment buildings in concrete instead of structural steel as contemplated by the original O'Driscoll plans. McFarland's commitment for his "Over and Above Loan" necessitated his paying a substantial premium, and other collateral costs were high. The Chemical Bank and Trust Company, prior to the Master Agreement, was urging expedition of the closing of the contracts and mortgage commitments, and the Federal Housing Administration was likewise endeavoring to consummate or abandon its commitments. McShain endorsed a substantial note for McFarland at a Washington bank to permit the payment of certain pressing obligations. McShain, as indicated heretofore, had furnished McFarland with letters to assist him in securing his financing and had undertaken the execution of a substantial bond necessary to permit the Land Corporation to acquire the tract upon which the project was to be built. There is, therefore, substantial evidence in the record to indicate financial pressure upon McFarland, particularly through the latter part of 1953, to move forward or abandon his operations. The Court is convinced that McFarland agreed to various changes suggested for the purpose of reducing the cost of the project and concludes that he agreed to the deletion of the "C" building, which building—his testimony indicates—had been the subject of discussion as to its deletion for a year or more prior to the execution of the Master Agreement.

The question still remains whether the plaintiffs are entitled to credit in the amount of $450,000 because the building was deleted. This question must be considered from two aspects: first, the testimony of the witnesses concerning an agreement, or lack of agreement, for credit for the "C" building; and second, the status and legality of the Supplemental Agreement, the document dated April 28, 1954 and heretofore referred to as Court Exhibit No. 4.

The witness McFarland has testified that he expected to receive a credit for the deletion of "C" building. He testified, however, that the only person to whom he ever spoke about a credit for the deletion of "C" building prior to the execution of the Supplemental Agreement was William M. Russell, a McShain employee, and Russell emphatically and repeatedly denied that McFarland at any time discussed with him the awarding of a credit for the deletion of "C" building and, as set out heretofore, testified that he and McFarland discussed the elimination of "C" building as one of the items involved in reducing the cost of the project. The testimony of various witnesses establishes that for a period of more than a year prior to the execution of the Master Agreement McFarland was in day to day communication with Russell, Hauck and McCarthy of the McShain organization and from time to time with John McShain himself. At no time, however, does McFarland state that he asked for credit for the "C" building, with the exception of the discussions heretofore mentioned with Russell and which discussions Russell, of course, denies. In the correspondence, particularly of March and April, 1954, McFarland does not seek or claim credit for the deletion of "C" building but does on occasions attempt to convince the McShain group that the "C" building was in the contemplation of all parties in the earlier stages of the project. The Court concludes that by a very substantial preponderance of the evidence, there was no agreement whatsoever to credit the plaintiffs with the cost of the "C" building.

The so-called Supplemental Agreement dated April 28, 1954, and heretofore identified as Court Exhibit No. 4 attached to this opinion, is challenged by the plaintiffs who contend that the agreement is void basically because it was obtained by duress. The plaintiffs' challenge of the agreement is predicated upon their contention that the agreement was involuntary because of coercion exerted upon the plaintiffs to secure the execution of the document. The plaintiffs contend that when McFarland was confronted with this document on the evening of April 27, 1954, he was not afforded an opportunity to consult counsel and was delivered an ultimatum that unless he and his associates signed the document, there would be no Federal Housing Administration closing on the following day upon Second Arlington Towers and that plaintiffs and defendants knew that unless the Federal Housing Administration closing was consummated the following day, the financing and consummation of the Second Arlington Towers project would fail, with disastrous consequences to the entire project. The defendants maintain the legality of the Supplemental Agreement.

The testimony establishes that the plaintiffs were under substantial pressure to consummate the Federal Housing Administration closing on the Second Arlington Towers project. The Chemical Bank and Trust Company had indicated its impatience at the delay in the closing, and McShain, as early as January, had advised McFarland of its desire to effect this closing within the following two weeks. The plaintiffs, through their representatives, applied to McShain in January for an extension of the time limit for the closing, which extension had been denied. The plaintiffs point out that John McShain was absent from his office during a period of January and February, 1954 and contend that an actual closing would have been impossible during this period. The testimony concerning a power of attorney executed by John McShain for a member of his staff is not conclusive as to whether there could or could not have been a closing during this period. Be that as it may, the evidence indicates that John McShain was available in March and April, 1954 for the closing.

It is established by the evidence that McFarland was represented by New York and Washington attorneys in the years 1953 and 1954. The evidence discloses, however, that McFarland dealt at arms length on a day to day basis with the McShain organization and that most frequently his counsel were not present during these conferences. There is no showing that McFarland at any time prior to April, 1954, deferred consideration of action upon any matter for the purpose of consulting his counsel. When he was summoned to the office of the defendant Shea on the evening of April 27, 1954, a draft of the Supplemental Agreement was shown to him. This agreement was prepared basically by Joseph McCarthy, then an attorney representing John McShain, but now an officer of the plaintiff corporations. McFarland argued about certain of the provisions of the agreement, and according to his own testimony, claimed that it was unfair and did not represent his understanding with McShain. McFarland says that he was told that the agreement would be signed or there would be no closing on the following day on Second Arlington Towers. McFarland left the conference in Shea's office with the original of the Supplemental Agreement in his possession. He did not sign it at the conference. Thereafter, and that same evening, he located his two associates in this project, Edward Johnson and John Loughran, obtained their signatures to the agreement, and signed it himself. He made no effort to reach his attorneys but returned the Supplemental Agreement on the following day to McShain representatives where it was in turn executed by them.

The Federal Housing Administration closing on Second Arlington Towers took place on April 28, 1954, and the building of this unit moved forward. It was some time thereafter before McFarland raised the issue of whether he would receive a

credit on the construction price for the omission of "C" building.

Counsel have cited to the Court a variety of cases upon the general subject of business duress or coercion.[1] This doctrine has not been established with any certainty in this jurisdiction, although its existence as a doctrine is recognized by casual reference in one or two reported cases.[2] There is no doubt but that substantial law has been established in a number of jurisdictions holding that under some circumstances coercion or business pressure may invalidate a formal contract. The United States Supreme Court has recognized and approved this doctrine.[3] The factors necessary to invoke the operation of the doctrine vary somewhat in various jurisdictions, but most jurisdictions place emphasis on the fact that the factual circumstances reacting to the plaintiffs' economic disadvantage must have been created by the respondents' actions. From the Court's

review of cases cited by counsel, it appears that the majority of the recorded cases were decided fundamentally upon a factual basis, and opinions which appear conflicting in their conclusions are readily distinguishable upon this factual basis.

The Court concludes the Supplemental Agreement is not void or invalid because of coercion. The plaintiff McFarland had known for a substantial period of time that the McShain group contended that the "C" building was not in the project as contemplated by the Master Agreement. He had known for a year or more that the Federal Housing Administration considered the "C" building economically unsound, and he knew early in March of 1954 that the Federal Housing Administration commitment which had been issued about the end of February, 1954, provided for an insured mortgage for Second Arlington Towers which did not include the "C" building.

1. Young v. Hoagland, 1931, 212 Cal. 426, 298 P. 996, 75 A.L.R. 654; Ferguson v. Associated Oil Co., 1933, 173 Wash. 672, 24 P.2d 82; Oswald v. City of El Centro, 1930, 211 Cal. 45, 292 P. 1073, 71 A.L.R. 899; Ramp Buildings Corporation v. Northwest Bldg. Co., 1931, 164 Wash. 603, 4 P.2d 507, 79 A.L.R. 651; Fowler v. Mumford, 1954, 9 Terry 282, 48 Del. 282, 102 A.2d 535; Ensign v. Home for Jewish Aged, Mo.App.1955, 274 S.W. 2d 502; Hazelhurst Oil Mill & Fertilizer Co. v. United States, 42 F.2d 331, 70 Ct.Cl. 334; Freund v. United States, 1922, 260 U.S. 60, 43 S.Ct. 70, 67 L.Ed. 131; Kilpatrick v. Germania Life Ins. Co., 183 N.Y. 163, 75 N.E. 1124, 2 L.R.A.,N.S., 574; Vandyke v. Wood, 60 App.Div. 208, 70 N.Y.S. 324; Brown v. Worthington, 1912, 162 Mo.App. 508, 142 S.W. 1082; Pittsburgh Steel Co. v. Hollingshead, 1916, 202 Ill.App. 177; Harris v. Cary, 1911, 112 Va. 362, 71 S.E. 551; 47 H.L.R. 1413; Williston on Contracts Sec. 1603 pp. 4495, 4496, Sec. 1617; United States v. Old Settlers, 1892, 148 U.S. 427, 13 S.Ct. 650, 37 L.Ed. 509; United States v. Child & Co., 1870, 12 Wall. 232, 20 L.Ed. 360; Automatic Radio Manufacturing Co. v. Hazeltine Research, 1 Cir., 1948, 176 F.2d 799, 804, affirmed 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312, rehearing denied 340 U.S. 846, 71 S.Ct. 13, 95 L.Ed. 620; Shipley v. Pittsburgh & L. E. R. Co., D.C.W.D.

Pa. 1949, 83 F.Supp. 722, 762; Lawlor, v. National Screen Service Corp., 3 Cir., 1954, 211 F.2d 934, reversed on other grounds, 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122, 1123; Lawrence v. Muter Co., 7 Cir., 1948, 171 F.2d 380, 382, certiorari denied Metropolitan Trust Co. v. Muter Co., 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1720; Fruhauf Southwest Garment Co. v. United States, 1953, 111 F.Supp. 945, 951, 126 Ct.Cl. 51; Barnette v. Wells Fargo Nevada Nat. Bank, 270 U.S. 438, 46 S.Ct. 326, 70 L.Ed. 669; Meyer v. Guardian Trust Co., 8 Cir., 296 F. 789, 35 A.L.R. 856; Sanche v. Electrolibration, 4 App.D.C. 453; Northern Pac. Ry. Co. v. United States, D.C.Minn. 3rd Div.1946, 70 F. Supp. 836, affirmed 8 Cir., 188 F.2d 277. 17 Am.Juris. Sec. 177, p. 892; 17 Am. Juris. Sec. 25, p. 903; 17 C.J.S., Contracts, § 172, p. 532.

2. Sekulow v. 11th & F St. Valet, Inc., 1947, 82 U.S.App.D.C. 244, 162 F.2d 19, 22; Fruhauf Southwest Garment Co. v. United States, 1953, 111 F.Supp. 945, 126 Ct.Cl. 51.

3. Hartsville Oil Mill v. United States, 1926, 271 U.S. 43, 46 S.Ct. 389, 70 L. Ed. 822; But cf. Hazelhurst Oil Mill & Fertilizer Co. v. United States, 42 F.2d 331, 70 Ct.Cl. 334. United States v. Bethlehem Steel Corp., 1941, 315 U.S. 289, 62 S.Ct. 581, 86 L.Ed. 855.

He knew that because of the elimination of the "C" building, the money to be advanced by the Chemical Bank and Trust Company and the Teachers Insurance Company had been decreased, and yet, he had made no request or demand for a credit for the deletion of this item from the McShain group, other than his disputed discussions with Russell. It is significant to the Court in this regard that McFarland did not, during this crucial period, make any written request of McShain for credit for the deletion of the "C" building, although he was in correspondence with McShain before and after the April, 1954 agreement with reference to various aspects of the construction and financing of the project.

The plaintiffs in their claim of coercion rely upon the fact that McFarland was presented with the Supplemental Agreement on the day before the Federal Housing Administration closing was due to be held. The plaintiffs point out that the Chemical Bank and Trust Company and the Federal Housing Administration had indicated that no further extensions of the closing date would be granted and that, consequently, if the closing was not effected on April 28, 1954, the financing for this part of the project would have collapsed. It is not the Court's responsibility to conjecture as to what would have happened if the closing had not been completed on April 28, but the testimony indicates that extensions had been granted on closing dates on earlier occasions. The Court concludes that McFarland, Loughran and Johnson executed the Supplemental Agreement deliberately because they wanted the Second Arlington Towers project completed, even without "C" building. The Court believes that these plaintiffs had ample opportunity to consult counsel if they desired to do so. There are legal questions suggested by the Master Agreement which might have been considered by plaintiffs, especially in asserting any rights existing under the Master Agreement, which might have required the defendants to construct the Second Arlington Towers project under obligations incurred in that Agreement, and without any reference to the Supplemental Agreement. The plaintiffs did not make any effort to consult their attorneys. They, out of the presence of the attorneys McCarthy and Shea, executed the Supplemental Agreement and returned it the next day. Thereafter, the provisions of the Supplemental Agreement were carried out on both sides, and the apartment building and commercial building "B" were constructed by the defendants. The plaintiffs have taken full advantage of the provisions of the Supplemental Agreement insofar as they resulted in the construction provided for therein, and since the completion of the buildings have collected the rents therefrom.

The Court has considered other suggested grounds challenging the validity of the Supplemental Agreement but has concluded that the Agreement was a valid one, binding upon the parties, and the Court must accordingly rule against the plaintiffs upon this issue.

It is the Court's conclusion that the parties are bound by the terms of the Supplemental Agreement and that the plaintiffs are not entitled to a reduction of $450,000 from their contractual obligations to defendants.

*Date of Completion of Contracts.*

The Court is required to determine, as a basis for factual findings, the dates upon which the building of various units was completed and to determine the date of the completion of the entire contract. The testimony of the witnesses as to the length of time necessary to complete the individual buildings varies. At one point in the negotiations, the plaintiff McFarland quotes Hauck of the defendant corporation as stating that the defendants would require 8 months to complete each individual building. Later, however, McFarland quotes McShain as saying that the defendants would require from 10 to 12 months for the construction of each building. The Chemical Bank and Trust Company, in connection with its "Over and Above Loan" made provision for interest payments to cover a period of 18 months during construction. At another

point in McFarland's testimony, he stated that McShain took exception to Hauck's estimate of 8 months for the completion of the individual buildings. There does not appear to be any conclusive oral testimony establishing a specific agreement as to the time to be required for the construction of each building.

Turning to the documents admitted in evidence in the case, it is observed that the "Construction Contract—Lump Sum" provides under the heading, "Time of Completion," that the work covered by the contract "shall be completed to the satisfaction of the architect and the owner within 14 months from the beginning." Subsequent sentences in this section of the "lump sum contract" provide that in no event shall the work to be performed be considered to be completed until all items called for in the drawings and specifications have been fully completed and "the contract price paid in full." There is in evidence a "Construction Contract—Lump Sum" for each of the building projects, the Court's quotations above being taken from plaintiffs' Exhibit No. 40-C. It being noted that plaintiffs and the defendants signed the lump sum contract, it would appear that the 14 months provision was binding upon them. Other documentary evidence, however, includes a set of specifications for each of the projects, which specifications, of course, are a part of the overall agreements between the parties. Incorporated in these specifications is a document entitled, "FHA Supplementary General Conditions," of which paragraph 6 provides as follows:

"The Contractor shall acceptably correct any defects due to faulty materials or workmanship which appear within a period of one year following substantial completion. The date of substantial completion is the date when the project has been acceptably completed in accordance with the drawings and specifications, when the entire project has been accepted for occupancy by the local authorities having jurisdiction and by the Lender and the FHA, *and*

*when the mortgage has been finally endorsed for insurance.*" (Emphasis supplied.)

This quotation is taken from plaintiffs' Exhibit No. 40-B.

There are other provisions in the documents having some reference to completion, but the Court is of the opinion that the project was completed for the purposes of this case when the mortgages were finally endorsed for insurance. Although defense counsel contend that all projects were completed on February 2, 1956, because the Federal Housing Administration on that date certified the completion of the project, the Court is of the opinion that the project was completed on May 22, 1956, upon which date the mortgages were endorsed for completion.

### Delay in the Construction of First Arlington Towers.

The plaintiffs contend that there was a delay of approximately 6 months in the construction of apartment building No. 1, which is covered by the First Arlington Towers Corporation contract. It is the contention of plaintiffs that this delay was due primarily to the attitude of the defendants in charging the plaintiffs an unacceptable figure for proposed changes in this building under circumstances which the plaintiffs say entitled them to substantial credit rather than to be assessed additional charges. The plaintiffs' testimony is substantially that the figures proposed by the defendants were unacceptable to them and that their own counter figures were rejected by the defendants, with the result that an impasse was reached, resulting in the work in this building being at a standstill for some 6 months. The plaintiffs contend, of course, that this delay resulted in the incurring of additional interest charges on the project and also resulted in the loss of 6 months rental from this building.

The defendants admit that delay occurred in the construction of this building. They say, however, that there were several causes for the delay, one of which

was the defendants' inability to determine specifically from the plaintiffs the changes that the plaintiffs wanted to make. Defendants' witnesses testified that the delay was due in part to the inability of plaintiff McFarland to make up his mind as to the changes he desired, especially in the dining area and penthouses, and that consequently, the defendants could not proceed with the work pending this determination. The defendants' witnesses further testified that there was some delay in obtaining the drawings for the proposed changes from the plaintiffs' architect and that there was also a dispute, or disputes, concerning the costs and/or credits for the proposed changes which contributed in some degree to the delay. Ultimately the work was resumed and the building completed, apparently without final agreement being reached between the parties upon certain items of cost involved in the changes.

Upon the basis of all of the evidence in the case, the Court does not feel that the plaintiffs have maintained the burden of proof and established by a preponderance of the evidence that the delay in the completion of First Arlington Towers building was due exclusively to the culpability of the defendants. The Court is of the opinion from the evidence that the plaintiffs have failed to establish any right to recover upon this item.

It may be noted here that the date of completion of the contracts has no reference to the date upon which occupancy of the buildings began. According to the testimony of the witness, Harry H. Tegge, occupancy of Fourth Arlington Towers began on November 1, 1954; occupancy of Third Arlington Towers began on December 14, 1955; occupancy of Second Arlington Towers began on March 1, 1955, and occupancy of First Arlington Towers began on April 1, 1955.

*Work Inadequately or Improperly Done and Work Incompleted.*

This aspect of the case does not include work which was the subject of the Arbitration Agreement and which is treated separately hereafter. Basically, this aspect of the case relates to the claim of the plaintiffs that they are entitled to substantial credit from the defendants for work improperly or inadequately done and for cleaning and other correctional steps made necessary by defendants' failure to fulfill their obligations in connection with the required building. The plaintiffs' claims relate generally to their charges that the plastering work was improper and inadequate; that the painting work was of an inferior quality; that certain shelving was rough and unsanded; that there were insufficient hooks in clothes closets; that tile floors in bathrooms did not meet specifications; that tile in kitchens was soiled, as were window frames, and windows; that shower curtain chains, shower heads and door stops were missing; that refrigerators and stoves were not level when installed, and that a substantial amount of the required shrubbery was dead. This claim of plaintiffs also charges that apartments were dirty when turned over to the plaintiffs—that sandwich wrappers, milk containers, beer cans, etc. were found in the various apartments. Plaintiffs claim that it was necessary for them to expend more than $133,000 in cleaning and correcting these deficiencies, the figure representing both work that was done and work yet required to be done.

The itemizations of the individual defects are in a large number of documents referred to as "Punch lists," and many of these "Punch lists" have been admitted in evidence, the plaintiffs' Exhibit 74–A through E being a typical list, introduced in connection with the testimony of plaintiffs' witness, Harry H. Tegge. During the course of the building, it appears from the testimony that, in addition to the various punch lists prepared by plaintiffs representatives, other punch lists were prepared by representatives of the McShain organization, by representatives of the Federal Housing Administration, and by the architects of the project. There is wide disparity and point to point conflict between the testimony of the plaintiffs' witnesses and the testimony of defendants' witnesses as to the punch list

918

items. The plaintiffs' witnesses testified that during the first stages of the completion of individual apartment units, particularly in Fourth Arlington Towers, the defendants attempted to rectify defective or dirty conditions brought to defendants' attention, but that shortly thereafter the defendants discontinued their efforts to correct these conditions and ignored them.

In order to evaluate the evidence concerning the punch list items, it is essential to consider the time covered by the complaints upon this subject. The first apartments available for occupancy were in Fourth Arlington Towers and were rented approximately November 1, 1954. Occupancy was begun in Third Arlington Towers on or about December 14, 1955. Occupancy of Second Arlington Towers was begun on March 1, 1955 and occupancy of First Arlington Towers was begun on April 1, 1955. The practice with reference to the occupancy of apartments was to permit the plaintiffs to take over groups of apartment units as they became available. These groups, at least in the early stages of occupancy, embraced apartments on several floors and in various parts of a building. Later, the Federal Housing Administration caused a change to be made in this proceeding so that a group of apartments made available for rent was required to be on an individual floor or in an individual wing. The procedure followed, however, resulted in a situation in which certain apartments were being rented and occupied while construction work continued in adjoining or adjacent apartment units. The plaintiffs' witness Harry H. Tegge was the General Manager of the project from July of 1954. He testified that after the McShain organization had made some small amount of effort to correct defective conditions, the defendants thereafter failed to do anything upon the punch lists. According to Mr. Tegge's testimony, there was not a single apartment unit in the more than 1,600 units involved in the entire project which did not have improper or defective work, or require extensive cleaning before it was fit for occupancy. This witness identified a great number of punch lists which he said were turned over to the defendants either prior to or subsequent to the filing of this suit. Tegge testified that the defendants had to employ some 6 to 25 men to correct the conditions of improper work and to clean the apartments in order to bring them up to proper standards. The plaintiffs offered other witnesses as to these conditions and punch list items.

The defendants answered that they corrected each and every defective item which was brought to their attention and claim that they did the required corrective work either of construction or cleaning, except in those instances in which the defective condition was the result of tenant damage to an apartment unit. The principal witness for the defendants upon this point is Edmund R. Wright, Jr., who was employed as an expediter and general supervisor upon the Arlington Towers project from January 15, 1954 until October, 1955, he being the last representative of the McShain organization to leave the job. This witness testified that he personally inspected each of the apartment units and other spaces in the project, claiming that he was in each apartment unit at least six times. He testified that he, too, made punch lists which he delivered to the defendants' sub-contractors and that he took steps to determine that the criticized items were corrected. He testified that whenever Mr. Tegge, or any other of the plaintiffs' representatives, advised him of any defective condition in any part of the project, he took the steps necessary to correct it. He testified to the receipt of punch lists from the plaintiffs' representatives and detailed how he prepared other lists from plaintiffs' punch lists which he passed on to the individual subcontractors and further testified as to the means employed by him to verify that defective or dirty conditions were corrected. This witness testified that he had from 18 to 20 men, either of the defendants' employees or of sub-contractors' employees, working upon the punch list items and correcting them.

There is a quantity of testimony relating to the means by which the keys of the apartments ready for occupancy were turned over to the plaintiffs' representatives and some statements, especially of the witness Wright, that difficulties occurred because the rental program resulted in the occupancy of individual apartments in a locality where other apartments were unfinished and work was still being done thereupon. Without attempting to summarize the testimony of the witnesses of the plaintiffs and of the defendants upon these punch list items, it is observed that the plaintiffs, for practical purposes, say that none of the conditions about which they made complaints were corrected and the defendants' witnesses testified that each condition about which complaint was made was corrected.

There are two additional factors which the Court has considered in attempting to determine the true facts in this situation. The first factor is created by the testimony relating to inspections of the apartments by representatives of the Federal Housing Administration. The witness Ernest T. Reilly testified that as an employee of the Federal Housing Administration, he was the resident inspector upon the Arlington Towers project from January 20, 1954 to the middle of September, 1955. Reilly's inspection began with the excavation and pouring of the concrete for the first building and continued through the execution by him of the so-called 100% completion reports, which are defendants' Exhibit 50 A and B and 60 A and B. Reilly testified that prior to the rental and occupancy of individual apartments, he personally inspected them to determine whether they met the requirements of the Federal Housing Administration insofar as it was concerned with the completion of the project. As Reilly made his apartment by apartment inspection, he, too, prepared punch lists of individual items with which he was dissatisfied and turned his punch lists over to the McShain organization. When McShain's representatives advised him that the items upon these punch lists had been corrected, he again personally inspected the individual apartments to verify that the punch list items had in fact been corrected. This procedure was followed by him through all of the apartments in all four of the apartment buildings, and also in the other buildings, i. e., commercial buildings, garages, etc., which were embodied in the project. When Reilly was satisfied that the work had been completed in accord with Federal Housing Administration requirements, he reported this fact to Simpson, the chief architect of the Federal Housing Administration who then, accompanied by Reilly, made a complete inspection of all of the buildings. Simpson and Reilly started at the roof of each building and worked down through the building, during which time Reilly made up punch lists of items with which Simpson was dissatisfied. These punch lists were turned over to the McShain organization, and thereafter, Reilly rechecked these punch list items when McShain's employees had informed him that the work had been done. Reilly, on the dates enumerated hereafter, executed reports on Federal Housing Administration forms certifying that the work was 100% completed and met the requirements of the Federal Housing Administration with the exception of some small items covered by escrow withholdings which are of no significance here because of subsequent certification of the completion of these items.

The Exhibit number and dates of Reilly's 100% completion reports are as follows: Plaintiffs' Exhibit 59–A, First Arlington Towers, dated December 16, 1955; 59–B, Fourth Arlington Towers, dated July 15, 1955; 60A, Second Arlington Towers, dated July 26, 1955, and 60–B, Third Arlington Towers, dated July 15, 1955.

Reilly testified that all of the work upon the Arlington Towers project was completed from his viewpoint in accordance with the plans and specifications.

The second factor which the Court has seriously weighed in considering the tes-

timony on the punch list items is represented by defendants' Exhibit No.'s 58–A, B, and C. In weighing these items of evidence, it should first be noted that the plaintiff's general manager, Tegge, had been residing in the project since July of 1954 and the first apartments were occupied by tenants about November 1, 1954, with the occupancy of the other buildings following in March and April of 1955. According to Tegge's testimony, the defendants had failed to take any action whatsoever on the punch list items at any time from shortly after November, 1954, Despite this fact, Tegge, on May 29, 1955, wrote a letter (Defendants' Exhibit 58–A) for the defendants' employee Wright in which he stated:

"Roddie Wright was employed in a supervisory capacity by John McShain Construction Company, the builders. Mr. Wright's services and ability proved invaluable in the many problems arising in a job as large as ours. His ability to handle men and his untiring efforts to get things done in a hurry have contributed much to the completion and splendid job done by his organization."

The Court points out that this letter was written at a time when, according to the plaintiffs' testimony, defendants had been consistently refusing to take any action whatsoever upon the items about which the plaintiffs' witnesses say they had been complaining for months.

In the same vein, the Court points to defendants' Exhibit 58–C, which is a letter written by Mr. Tegge, on May 29, 1955, to Paul Hauck, the principal Washington officer of McShain's organization, in which letter he stated that:

"* * * it has always been a great satisfaction to call upon you and your fine organization for our many requests and adjustments which unavoidably come up on jobs the size of ours.

"* * * * It is only through the experience and drive of men like yourself, Ben Kauffman, Dick

Bowers and especially Roddie Wright that the final end result and details of the finished product are achieved.

"I speak particularly of Roddie Wright because of his ability to handle the men working with him in completing the many 'punch items,' which are always done in a cheerful efficient manner.

"* * * It is our wish that we may continue where you leave off to carry on with the same success and satisfaction."

Again, it is difficult to reconcile this letter with the claims made by the plaintiffs in this suit which was filed less than one month after Tegge's letter to Hauck.

There is another exhibit in the case to which the Court must direct attention, that exhibit being Defendants' Exhibit No. 62, which is a letter of May 22, 1956, addressed to the Federal Housing Administration by the plaintiff Walter McFarland in behalf of First, Second, Third and Fourth Arlington Towers corporations. Defendants' counsel made some effort to show that while the plaintiffs, through McFarland, were pretending to McShain that they were attempting to have the balance of the Federal Housing Administration insured funds released to the defendants, they were, in fact, calling upon the Chemical Bank and the Federal Housing Administration to withhold the payment of these funds to the defendants. The Court sustained objection to a substantial part of this testimony, but in some documents admitted in evidence there are references to the fact that the plaintiffs desired to withhold all the remaining sums in order to insure the completion of unsatisfactory or incomplete work. Defendants' Exhibit No. 62, dated May 22, 1956, becomes significant, then, because in it McFarland refers to paragraph 16 of the original complaint filed in this case which alleges the failure of the defendants to complete the project as provided, and states with reference thereto: "Complaint in question was prepared and filed in June, 1955. We hereby affirm it to you that the work in question

has since been completed by John Mc-Shain, Inc., and no part thereof remains to be completed."

Upon the basis of all of the testimony in the case relating to the punch list items, the Court concludes that the plaintiffs have not established their claim by a preponderance of the evidence. The Court further concludes that the preponderance of the evidence favors the defendants' contentions as to these items.

The punch list items numerically total several thousand items which vary in size from a missing button upon a Venetian blind draw string to items alleging serious mechanical defects. A group of exhibits identified as Plaintiffs' Exhibits No. 124 through 132, relate to defective concrete in garage areas. The photographs illustrate a condition which the Court feels is not in accord with the specifications in the contract, but the Court must qualify this conclusion because some testimony indicates that this space was originally designed to be dead storage space and was finished as such. This testimony makes it impossible for the Court to appraise the photographs and evaluate them with any degree of accuracy, nor is the Court able to determine the extent of the conditions, these conditions being described by one witness as existing "more or less throughout the garage area." The Court does not believe that the plaintiffs have established this item with such specificity as to permit the Court to place a money value upon the work necessary to correct the condition.

Plaintiffs' Exhibits No. 133 through 139 relate to claims of improper shelving in clothes closets, and Plaintiffs' "Exhibits No. 140 through 142 portray bathroom tile photographs. The testimony of various witnesses as to these items varies, but the Court cannot say with any assurance as to the extent of these conditions or as to the proper measure of damages in correcting them. As to the shelving items, it would appear that if these conditions exist in one or two or three clothes closets, the cost of repairs is infinitesimal. With reference to the bathroom tile photographs, the witnesses to whom the Court can look for guidance are not in agreement as to the significance of the discolorations, and the Court is consequently furnished with no substantial data upon which to make a finding upon these points.

*John McShain's Undertaking to Post Sums Necessary to Cover "Mortgage Points."*

The testimony of the plaintiffs, especially through the witness Walter McFarland, establishes that during the negotiations for financing of the Arlington Towers project, the plaintiffs were confronted with an adverse mortgage market which necessitated their contracting for mortgages at a discounted rate. Since the discounted mortgages brought into the project a lesser sum than the plaintiffs had expected or had hoped for, McFarland advised John McShain of the difficulty and McShain agreed to advance a sum not to exceed 4% of the over and above mortgage commitments, this 4% representing the discount demanded by the bank on these items. Later, McShain's agreement was altered to provide that McShain would assume an amount not to exceed 2½% of the principal amount of this mortgage commitment. The plaintiffs were to pay the additional 1½% of the mortgage discount. In addition to the oral testimony relating to this aspect of the transactions, the details are set forth in Plaintiffs' Exhibits No. 21, 22, 23 and 28. The plaintiffs agreed that if John McShain was not reimbursed by cash for any amount paid by McShain on the mortgage discount, the plaintiffs would furnish him with a note covering the amount which McShain had paid which note would not exceed 36 months to maturity. No provision was made for any interest on this note. At the final closing of the entire project on May 22, 1956, the defendant McShain did not pay or advance any part of the mortgage discount, and as a result, the plaintiffs were required to borrow $290,000 to supply additional funds to total the $412,000 representing the over-all amount of the mortgage discounts.

The defendants deny any liability for mortgage discounts. Defendants' witness John McShain testified that the commitment was not binding upon the McShain company.

The Court is of the opinion that a valid and binding agreement was in fact made between McFarland and McShain, the consideration for the agreement being the mutual obligations that were assumed and undertaken by the parties as a result of the over-all commitments in the case. The Court is of the opinion that the plaintiffs are entitled to damages for McShain's breach of this agreement, these damages to be measured by the monetary loss suffered by the plaintiffs. This monetary loss, the Court concludes, is the interest at the legal rate which the plaintiffs must pay upon the $290,000 actually borrowed by them to meet this payment. This damage, computed at the rate of 6%, constitutes interest payments of $1,450 per month, or a total of $13,050, from May 22, 1956 to February 22, 1957.

### Plaintiffs' Claim of the Assignment from E. C. Ernst, Inc.

The E. C. Ernst Corporation was the electrical sub-contractor upon the Arlington Towers project. The Ernst company's bid for the electrical work was in the amount of $740,800.37. The defendant McShain, Inc. paid to Ernst upon this contract $586,360.66 leaving a balance due to Ernst of $154,439.71. The defendants admit the non-payment of this amount. It may be noted that the plaintiff Edward Johnson is the president of the R. C. Ernst Corporation. The defendants opposed the plaintiffs' motion to amend their complaint by adding a claim for the amount of Ernst's claim against McShain. The Court overruled this objection and permitted the filing of this claim. The assignment of the claim was proved. (Plaintiffs' Exhibit 149). The defendants brought forth some testimony indicating some agreement between the Ernst Company and McShain whereby Ernst would not press McShain for the balance due by McShain until the final or complete payments had been made to McShain by the Arlington Towers group.

There was testimony indicating that McShain at one time forwarded to Ernst a check in the amount of $50,000 as a partial payment upon the balance owed, but this check was not cashed by Ernst, apparently as a result of the agreement then existing between Ernst and McShain.

The Court is of the opinion that the plaintiffs may assert in this case the rights assigned to them by E. C. Ernst, Inc, especially since the disposition of this matter will facilitate and expedite the disposition of all of the matters presently pending between plaintiffs and defendants. The Court, according, awards judgment upon this item to the plaintiffs in the amount of $154,439.71, with interest at the legal rate from date of completion of the project, as determined by the Court to be May 22, 1956. This interest to February 22, 1957 is in the amount of $6,949.80, affording plaintiffs a total credit of $161,389.51.

### The Suit of John McShain Against Arlington Towers Land Corporation Upon the Promissory Note of April 29, 1954.

As set out heretofore in this opinion, this action was initially brought by McShain in the Eastern District of Virginia but was transferred to the United States District Court for the District of Columbia, for consideration with the case filed by the Arlington Towers group against the McShain organization in this District on June 25, 1955.

Under the terms of the note of the Arlington Towers Land Corporation dated April 29, 1954, that corporation obligated itself to pay to the McShain company on or before 18 months after the date of the note, the sum of $275,000, with interest at 6% per annum after maturity. The Arlington Towers Land Corporation is in default upon this note, and the Court concludes that the plaintiffs are entitled to judgment because of the default. This note became due and payable on October 29, 1955, demand was made for payment, and as indicated, the Arlington Towers Land Corporation has not made any payment upon the note. The Court accordingly finds that John McShain, Inc. is en-

titled to recover from the Arlington Towers Land Corporation in the amount of $275,000, plus interest at the rate of 6% per annum from October 29, 1955. The Court computes the interest on this amount to February 22, 1957, as totaling $21,705.20, and accordingly, awards the McShain corporation judgment in the amount of $296,705.20.

*The Arbitration Agreement.*

There is attached hereto and identified as Court Exhibit No. 5 a copy of the "Stipulation of Counsel Respecting Appointment and Duties of Arbitrator." This document was executed by the parties on or about December 6, 1955. Prior to its execution, plaintiffs and defendants, through their attorneys, had made some effort to effect a compromise or settlement of their differences concerning altered, added or deleted work. These settlement negotiations ultimately resulted in the determination to select an arbitrator to determine the value of the individual controverted items. Some delay ensued because of the inability of the parties to agree upon an arbitrator, but ultimately Edward G. Scharf was selected. He acted as Arbitrator, and on July 3, 1956 filed with the Court a document entitled "Award of Arbitrator" in which he found total credit due to the plaintiffs in the amount of $255,357 against debits owed the defendants in the amount of $70,662, or a net credit to the plaintiffs in the amount of $184,695. Shortly after the filing of the Arbitrator's award, the plaintiffs filed a motion for an order vacating and in all respects setting aside the award of the Arbitrator. The plaintiffs' motion charges that the Arbitrator determined matters not within the terms of the Arbitration Agreement and that having so done, his award must be vacated; that the Arbitrator's award was not made upon the basis of the standards imposed by the agreement of submission; that the Arbitrator failed to afford the plaintiffs opportunity to be heard on all relevant and material issues and that he took ex parte evidence; that the Arbitrator's award demonstrated prejudice and bias on his part; and

that the Arbitrator fraudulently concealed a prior business relationship between himself and the defendant McShain.

■ Although the Arbitration Agreement specifically provides that the award of the Arbitrator shall be final and binding, that neither party will contest such findings and that neither party will appeal from any portion of the final judgment, there appears to be no doubt but that the plaintiffs are within their rights in challenging the Arbitration award, particularly on the grounds that the Arbitrator exceeded his authority and upon the grounds of fraud, bias and prejudice.

■■ In evaluating and passing upon the evidence upon this point, the Court is guided by the principles of many adjudicated cases relating to the interpretation and effect of arbitration agreements. The Court, as in the case of all agreements, must give effect to the intent of the parties as evidenced by the agreement itself which will be liberally construed to that end. The Court further observes that although an arbitration agreement has the formal aspects of a contract, it nevertheless, by its very nature, assumes the absence of an agreement between the parties, other than the basic agreement on the mode of settlement. Arbitration is, then, a method, a means, a procedure, rather than an agreement. In other words, the function of arbitration is not to the creation of such relationships as normally fall within the sphere of contract, but is rather to the repairing of the breakdown of those relationships after the contract has established them.

There are standards, or criteria, for decision in arbitration, but these standards are in matters of procedure and evidence more flexible and more dependent upon the requirements of the particular case, or particular disputants, and on the arbitration agreement, than are normally found in the formal judicial settlement of disputes. In the words of Judge Learned Hand in the case of American Almond Products Co. v. Consolidated

Pecan Sales, 2 Cir., 144 F.2d 448, 451, 154 A.L.R. 1205:

> "Arbitration may or may not be a desirable substitute for trials in courts; as to that the parties must decide in each instance. But when they have adopted it, they must be content with its informalities; they may not hedge it about with those procedural limitations which it is precisely its purpose to avoid. They must content themselves with looser approximations to the enforcement of their rights than those that the law accords them, when they may resort to its machinery."

The plaintiffs' first challenge to the Arbitrator's award is predicated, as indicated heretofore, upon the allegation that the Arbitrator passed upon matters not within the terms of the Arbitration Agreement. This challenge is addressed specifically to pages 11 through 15 of the Arbitrator's award under the caption, "Changes originating with the Contractor." It will be observed from the award that Scharf, the Arbitrator, quoted excerpts from letters of February and June, 1955 exchanged between the plaintiffs and McShain and concluded from these letters that there was an agreement between the parties whereby the defendants might originate changes for the purpose of reducing the cost of the project and that such changes would not result in credits to the plaintiffs. The plaintiffs contend that the Arbitrator exceeded his authority in determining that there was such an agreement and thereafter ruling out of his award six specific items of changed work which the Arbitrator found were covered by the terms of this agreement. The Arbitration award defines the duties of Scharf, the Arbitrator, as being "to hear and determine certain of the issues in the above-entitled action, to wit:

> "The fair and reasonable value of credits and debits resulting from changes during the course of construction by altering, adding to or deducting from the work described in the plans and specifications ap-

proved by the F.H.A. on which construction was started in F.H.A. Projects Nos. 000,000–85; 000,000–84; 000,000–83; and 000,000–82 respectively known as Arlington Towers. In no event shall the Arbitrator determine any issue regarding Building C referred to in the Complaint."

The testimony in the case disclosed that very shortly after the execution of the stipulation of arbitration, the Arbitrator developed some doubt as to whether the attorneys had authority to commit their clients to the payment of his fee, and he, accordingly, communicated with McFarland and the defendants upon this subject. Doubt also arose in his mind as to the volume of work involved and as to the resulting adequacy of his fee. These doubts, in turn, resulted in the exchange of some correspondence with George F. Shea, attorney for the defendant McShain, the Arbitrator, Scharf, and between Milton Gould, attorney for the plaintiffs, and Scharf.

The evidence discloses that the defendants took the position that the arbitration stipulation was intended to cover only the changes in the project which were described in approximately 37 change orders which had been submitted by the respective parties to the Federal Housing Administration for its approval. (Defendants' Exhibit 101)

On the other hand, the plaintiffs contended that there were changes, deletions and modifications effected during the course of construction which were not reported by the contractor in any change orders and that consequently the Arbitration Agreement was intended to cover all changes, whether covered by change orders or otherwise. The plaintiffs contended that the Arbitration Agreement required the Arbitrator to base his computation upon a comparison between the original plans and specifications and the actual construction of the project. (Defendants' Exhibit 102). Plaintiff Walter McFarland, on December 8, 1955, by letter, expressed his understanding of the Arbitration Agreement as calling upon

the Arbitrator to make his findings upon the changes "whether or not supported by revised prints or formal change orders." (Defendants' Exhibit 108). The ultimate result of this dispute is portrayed in plaintiffs Exhibit No. 175 in which defendants' attorneys Shea and Murray agreed that:

"* * * in order to avoid further delay, we hereby advise you that it is our position that you may consider such valid proof which plaintiffs may deliver to you for the purpose of establishing credits, if any, which plaintiffs may claim are due because of changes made during the course of construction which were not covered by FHA approved change orders * * *"

The first problem of the Court is to determine the intent of the parties to the Arbitration Agreement as to the field in which the Arbitrator was to work. Prior to the time of the Arbitration Agreement, the parties were in dispute as to the extent and value of the changes, additions and deletions made during the course of the construction. The plaintiffs' complaint, filed on June 25, 1955, in paragraph 18, alleges that, "The plaintiffs were to be allowed a credit for the reasonable value of said deleted work as mutually agreed upon, or in the event of failure to agree, as determined by arbitration. The fair and reasonable value of said deleted work is not less than $400,000. Although plaintiffs have duly demanded that John McShain, Inc. and John McShain fix the fair and reasonable credit to be allowed for said deleted construction work, said defendants refused and still refuse to provide such computation, or otherwise arrive at the amount of such credit, or to negotiate in good faith to fix the amount of such credit."

This paragraph of the complaint, supported by the affidavit of Walter McFarland, was the basis for the controversy upon this point and it was this controversy which the parties were attempting to adjust when they agreed to arbitration. The arbitration agreement must be interpreted by its own provisions

and the construction placed thereupon by the parties, as exemplified in Defendants' Exhibit 102 and Plaintiffs' Exhibit 175, as heretofore discussed. There is nothing specifically exempt from the Arbitrator's authority as it is defined in the Arbitration Agreement as to disputed items, other than consideration of the "C" building project. The parties intended to have the Arbitrator determine completely the controversy on the items enumerated in paragraph 18 of the complaint. The Court cannot conceive that the Arbitration Agreement was intended to authorize the Arbitrator to find the fair and reasonable value of *some* changes, additions or omissions, but not other changes, additions or omissions. Neither the Arbitration Agreement, the letters exchanged between the parties and the Arbitrator, or other testimony, indicates any such intention. On the contrary, the evidence indicates that the parties intended the Arbitrator to pass upon the fair and reasonable value of all changes, additions and omissions. It is inconceivable that the parties intended a partial arbitration and a resort to the courts for decision upon other items of the same controversial issue. By the terms of his appointment, the Arbitrator could not ignore the six items which he found to be part of the agreement between plaintiffs and defendants. These six items certainly constituted changes, additions or omissions within the definition of the Arbitrator's appointment.

The plaintiffs say that the Arbitrator by finding that an agreement existed between plaintiffs and defendants on the six enumerated items was improperly exercising a legal function. The evidence discloses that he encountered these items in the course of his work as Arbitrator and realized he had to deal with them. Scharf's function, as defined by the Arbitration Agreement, was not only to determine the fair and reasonable value of the work but also to "hear and *determine* certain of the issues." and to make an award. (Emphasis supplied). Thus, his function was not merely that of an appraiser who was to determine value

and pass on his valuations to some other authority. His function was to determine the issues and to make the award. In discharging this function, he was called upon to exercise whatever authority was necessary to the completion of his duties. The Arbitration Stipulation is limited in the restraint placed upon the Arbitrator. As heretofore indicated, the controversy concerning the "C" building was eliminated from his responsibility. The Court believes that the evidence requires the conclusion that the Arbitrator was to hear and determine the issues relating to changes, additions or omissions in the project and to make an award, upon the basis of his findings. It must follow that in doing so he was required to consider all of the changes, additions or omissions and he properly considered the six enumerated items as within his authority. When, however, he studied these items, he was presented with copies of letters dated June 6, 1955, June 8, 1955, June 17, 1955 and February 18, 1955, from which the Arbitrator concluded that there was in fact an agreement between the plaintiffs and defendants whereby credit would not be afforded plaintiffs for changes, additions or omissions which originated with the defendants and which were made for the purpose of reducing the over-all cost of the project. The necessity for this reduction in the cost of the project has been heretofore discussed in this opinion.

The Arbitrator brought the letters which had come into his possession from the defendants to the attention of the plaintiffs. He testified concerning these discussions, and in addition, Plaintiffs' Exhibit 173, dated June 5, 1956, is a letter from the Arbitrator transmitting a photostatic copy of three of the letters to Joseph McCarthy who was then employed by the plaintiff. The fourth letter involved in this aspect of the Arbitrator's report is Plaintiffs' Exhibit 185. In addition, it is to be observed that on June 15, 1956, the plaintiff Walter McFarland addressed a letter to Scharf concerning Scharf's reliance upon the agreement which he found existed between the plaintiffs and defendants as to disposition of the six enumerated items. This letter is Plaintiffs' Exhibit 174.

The plaintiffs protested against Scharf's utilizing the identified letters as a basis for the finding of an agreement but they took no steps to offer counter evidence nor did they take any action to repudiate in any way the Arbitration Agreement. Instead, they awaited the filing of the Arbitration award, and thereafter, challenged it.

The Court is of the opinion, under all of the evidence upon this point, that the award of the Arbitrator should be upheld. The Court concludes from the evidence in the case that there was in fact an agreement of the character defined by Scharf that would permit the contractor to initiate money saving variations, and that the Arbitrator's award upon this point is a proper one.

The second challenge of plaintiffs to the Arbitrator's award is predicated upon their contention that they were not afforded an opportunity to be heard on all relevant and material issues and that the Arbitrator could not take ex parte evidence. The Arbitrator, throughout the more than six months of his work in this case, frequently and consistently interviewed representatives of one side or the other out of the presence of the opposing side. He held various conferences with defendants' representatives with no representatives of the plaintiffs present, and he held frequent conferences with plaintiffs' representatives with no representatives of the defendants present. The Arbitrator traveled to New York on one or more occasions to consult with the firm employed by the plaintiffs to do their estimating in connection with the Arbitration items. He consulted other persons employed by the plaintiffs from time to time as he thought it was necessary and did the same thing in consulting representatives of the defendants. Both parties knew of this procedure and made no protest against it. The Court is of the opinion that the Arbitrator's conduct must be evaluated in the light of all of the circumstances in the case, the intention and knowledge of

the parties to the agreement and the requirements of the problem. Upon the evidence, the Court does not believe that the Arbitrator's conduct was such as to require or even justify the Court in setting the award aside upon this ground.

■■ During the course of this trial, the plaintiffs, especially in cross-examination of the Arbitrator Scharf but also through the testimony of plaintiffs' witnesses, attempted to discredit the computations of the Arbitrator. Admittedly, the Arbitrator was selected because of his extensive background and experience in the building industry. The terms of the Arbitration Agreement empowered the Arbitrator to determine the fair and reasonable value of the changes. The Arbitrator was expected to utilize his own knowledge and experience in appraising the conflicting claims of both sides. Although the plaintiffs in their original complaint had claimed the total items involved in the changes to be "not less than $400,000", their ultimate claims filed with the Arbitrator totaled more than $1,000,000. The Arbitrator was not required to accept the figures of either side, or any side, and was in fact engaged to exercise his own judgment. The evidence indicates that upon some items in which the figures of the representatives of the defendants and the plaintiffs were in agreement as to the value of the item, the Arbitrator, nevertheless, substituted his own figure for the particular item. This, the Court believes, was not improper since the Arbitrator was to place his own fair and reasonable value upon the work. When an arbitrator is himself an expert in the field of the arbitrated controversy, he is empowered, unless specifically restricted, to exercise a discretion predicated upon the length and area of his expertness. It is not improper, therefore, with an Arbitrator who has been selected as an expert, to accept his findings as a matter of discretion, even though they are in conflict with the testimony offered to him.

Plaintiffs are also critical of the fact that the Arbitrator hired some help in computing figures or obtaining data upon which he based some of his awards. The Arbitrator, by his testimony, convinced the Court that although he obtained advice or information from one or more persons employed by him, he did not accept the findings of those persons as conclusive and exercised his own independent judgment upon the information furnished by them and again made his own determination as to the fair and reasonable value of the factors involved in these items.

■ The next challenge of the plaintiffs to the Arbitrator's award contests its validity on the ground that the Arbitrator showed prejudice and bias towards the defendants. The Court does not believe that the evidence establishes this change. The Court believes that the Arbitrator fairly and honestly attempted to place his fair and reasonable value upon the items which he considered. Even though the Arbitrator's findings varied in some aspects from what the Court would have found upon the same items, the Court cannot upon that ground set aside the award in the absence of some affirmative showing of prejudice or bias. The mere fact that the Court's viewpoint upon individual items may vary from that of the Arbitrator is not basis for setting aside the award.

■ The parties bargained for and agreed to the acceptance of the Arbitrator's finding, and having done so, they must be content with his conclusions unless bias or prejudice are clearly shown; and, the Court repeats, it does not feel bias and prejudice have been clearly shown in this case.

The final challenge to the arbitration award is predicated upon the plaintiffs' contention that the Arbitrator, Edward G. Scharf, failed to disclose a prior "business relationship" existing between himself and McShain. It is plaintiffs' position that subsequent to the issuance of the arbitration award, the plaintiffs learned that Scharf had listed the McShain corporation as a client of his in a brochure which Scharf used in solicit-

ing business. (Plaintiffs' Exhibits 169 and 194–B)

The first point in plaintiffs' challenge in this regard is predicated upon the contention that Milton S. Gould, plaintiffs' counsel, in an interview with Scharf prior to his selection as Arbitrator, inquired of Scharf whether he had any prior "business dealings" with any of the parties to the controversy. Mr. Gould testified affirmatively on this point that he had in fact asked such a question, or questions, and that Scharf had denied any business dealings. Mr. Gould's testimony embraced discussions occurring both in the office of the defendant Shea and subsequently in the corridor or elevator after he and Scharf had left the meeting. Gould testified that Scharf had said, with reference to the McShain group, that he never had anything to do with them. Concerning this point, the Arbitrator Scharf has challenged the testimony of Gould that any such questions were asked him. In addition, the defendant Shea who was present at the conference in question, has denied that Gould asked Scharf questions concerning any such association with McShain, and the witness, Charles Murray, also present at the conference, has testified that no such discussion took place. The Court concludes that there is no preponderance of the evidence upon this point sustaining the plaintiffs' contention. The witnesses agreed generally that Mr. Gould inquired whether Scharf could act in an unbiased, unprejudiced, or objective manner and that Scharf testified that he could so act.

The second prong of this challenge to the arbitration award is predicated upon the premise that Scharf, having had a business dealing with McShain some 15 years prior to the Arbitration Stipulation, is so stained by this association as to make his participation in the arbitration proceedings a fraudulent one. Scharf testified, and there is no refutation of his testimony, that he, in his capacity as an estimator, solicited business from McShain approximately four times in a period of 15 years, but that

his services were never retained by McShain. He further testified that some 13 years ago, he prepared estimates for contractors who were competing with McShain for a building project at Bainbridge. Scharf's employers were unsuccessful in their bid for this project which was ultimately awarded to the McShain company. After the award was made to McShain, Scharf wrote McShain offering to sell his computations as to the quantities involved in this project, and McShain purchased Scharf's figures for "$75 or $85". The plaintiffs contend that this fact disqualified Scharf from rendering a fair and objective report in this case.

The Court does not feel that the very minor transaction antedating the Arbitration Stipulation by 13 years was of sufficient importance to per se disqualify Scharf as the Arbitrator. It is to be noted that Scharf basically functioned in the Bainbridge project in behalf of a competitor of McShain, and the evidence discloses that McShain, Inc., on some four occasions, declined to avail itself of Scharf's service.

Other testimony was offered concerning some alleged personal relationship between Scharf and Russell of the McShain staff, but the Court does not feel that this evidence is of sufficient weight or significance to justify the setting aside of the award.

In closing argument, counsel for the plaintiffs suggested that Scharf's conduct in the arbitration proceedings constituted a fraud upon the plaintiffs. In the case of Public Motor Service v. Standard Oil Co. of New Jersey, 69 App.D.C. 89, 99 F.2d 124, 126, the Court of Appeals of this District has stated:

"It is settled also that fraud must be shown by clear and convincing evidence * * * and by evidence which is not equivocal, that is, equally consistent with either honesty or deceit."

Applying this principle to the evidence, the Court finds that the plaintiffs have not established fraud on the part of the Arbitrator.

*Miscellaneous Items.*

The defendants claim recovery from the plaintiffs of the sum of $40,213.73 representing various items paid by the defendants for plaintiffs. The details of these items are set forth on pages 3,443 and 3,444 of the transcript of testimony. The Court concludes that the defendants are not entitled to recover $13,277.06 for building permits because the defendants have failed to prove that the amount expended for building permits was not within Article 2 of the General Conditions of the contract which provides, " * * * permits and licenses of a temporary nature necessary for the prosecuting of the work shall be secured and paid for by the contractor." The testimony concerning these licenses does not establish to the Court's satisfaction that the licenses were in fact "permanent building permits," as referred to on page A–2 of the specifications. The Court, accordingly, finds for the defendants in the amount of $26,936.67.

The pre-trial order states several issues upon which the Court ruled during the course of the trial. The Court ruled that the defendants could not invoke the "unclean hands doctrine" for the purpose of establishing in evidence facts relating to the agreements between the present plaintiffs and the O'Driscoll group relating to the acquisition of the real estate by the plaintiffs.

The Court ruled that the defendants did not at the time of the trial have sufficient status to enable them to offer testimony showing that the individual plaintiffs have improperly received loans, advances, payments, free or reduced rentals, or other benefits from any of the plaintiff corporations.

The Court also ruled that the defendants at the time of trial had no status entitling them to offer testimony charging waste or mismanagement to the plaintiffs.

The Court did, however, permit counsel representing the defendants to inspect the books and records of the plaintiff corporations and ruled upon questions as to the admissibility of such questions as arose during the course of the trial.

The testimony in the case disclosed that the plaintiff McFarland, on his own initiative, discontinued the practice of submitting corporate records to the defendant Shea for affixing of the corporate seal. The Court does not believe upon the evidence in the case that McFarland was legally justified in this action and finds that there was a breach of the terms of the December 18, 1953 agreement by McFarland.

The Court finds that the plaintiffs breached the terms of the Master Agreement and that plaintiffs breached the terms of the Supplemental Agreement.

The Court finds that plaintiff McFarland represented to the defendant McShain on a number of occasions that he had assurances that the Federal Housing Administration would guarantee loans of at least $17,000,000 for the construction of this project, and that on such representations McShain initially agreed to the construction undertaking.

The Court finds that the drawings and specifications referred to in paragraph one of the Master Agreement, dated December 18, 1953, were not completed at the time of the signing of this agreement, the evidence indicating that on December 18, 1953, the drawings and specifications for 4 groups of buildings were in varying stages of completion.

The Court has heretofore set forth other findings upon other issues of facts.

There is testimony in the case relating to a decorative fountain, the installation of which has never been completed. At the time of the trial, there was testimony indicating that the McShain organization was at that time taking some steps to complete this installation which has been delayed due to the inability of a quarry to furnish a stone slab, or slabs, in the proper size. The completion of this fountain is an obligation of the McShain organization which the contract requires to be completed.

*Observations and Conclusion.*

The Court in formulating its rulings upon this case has considered all of the

evidence in the case relating to the individual items. This opinion, although lengthy because of the number of issues, does not purport to set forth all of the evidence considered by the Court upon individual items. Citation, or reference, to a specific exhibit or a specific item of testimony does not infer that the Court has used only this evidence in reaching its conclusion upon a particular point. Citations of documents and testimony are intended to be illustrative rather than comprehensive, because of the Court's desire to afford diligent counsel on both sides of this case an opportunity to know in general the items of evidence which have prompted the Court's rulings.

The exhibits in evidence in the case exceed 300 in number. The testimony of most of the more than 40 witnesses deals with a variety of controverted items.

The Court in reaching its opinion upon these individual items has correlated the testimony of all of the witnesses relating to each item with the documents relating to that item.

The Court finds that the plaintiffs, by their obligations in this case, undertook to pay the defendants $18,000,000 for the construction of the project. The defendants have actually received from the Federal Housing Administration insured loans the sum of $15,745,691.50. There is thus owed upon the Master Contract to the defendants the sum of $2,254,308.50. There is to be added to this figure the amount of $26,936.67 representing the items paid by defendants for plaintiffs' account. The total thus owed to the defendants is $2,281,245.17.

Against this obligation, the plaintiffs are entitled to the following credits:

| | | |
|---|---|---|
| 1. | Interest expenses for mortgage discount payments | $ 13,050.00 |
| 2. | Amount of E. C. Ernst claim, plus interest | 161,389.51 |
| 3. | Amount of Arbitrator's award | 184,695.00 |
| | | $ 359,134.51 |

The balance owed by the plaintiffs to the defendants under the terms of the contracts, then, totals $1,922,110.66. The plaintiffs are in default upon this balance for a total of $1,498,685.04. This figure is composed of the following items:

| | | |
|---|---|---|
| 1. | Principal and interest of the note of $275,000 referred to in paragraph B of the Supplemental Agreement | $ 296,705.20 |
| 2. | Principal and interest on the note of $450,000, referred to in Paragraph C of the Supplemental Agreement | 453,750.00 |
| 3. | Principal and interest of the balance of the contract price referred to in paragraph D of the Supplemental Agreement | 553,127.36 |
| 4. | Specified first payment and interest thereupon upon first installment of defendant's profit on the transaction, as specified in paragraph 5 of the Master Agreement | $ 168,165.81 |
| 5. | Amounts paid by the McShain Company for plaintiffs' account | 26,936.67 |
| | | $1,498,685.04 |

The Court, in computing interest, has utilized the dates set forth in the Contract and Agreements wherein provision has been made for dates or terms of interest. In the absence of specific provision of terms of interest, the Court has utilized the completion date, May 22, 1956. Interest, where not otherwise defined, has been computed at the rate of 6% on the basis of a 360 day year, and with reference to paragraph 5 of the Master Agreement, the Court's has computed the interest upon a daily basis.

The Court finds that the defendants are entitled to the following relief and directs that counsel submit appropriate order to carry into execution this relief:

The plaintiffs will deliver to the defendant George F. Shea as escrow agent all minutes and all corporate seals of each plaintiff corporation which have not heretofore been delivered to defendant George F. Shea.

Defendant George F. Shea is authorized to deliver to defendant John McShain, Inc. and defendant John McShain, Inc. is authorized to receive: a) all certificates of stock endorsed in blank of all plaintiff corporations; b) the undated resignations of the officers and directors of all plaintiff corporations; c) the minutes and minute books of all plaintiff corporations; and d) all seals of all plaintiff corporations.

The defendant John McShain, Inc., its agents, employees and representatives are authorized forthwith to take over and manage the affairs of plaintiff corporations pursuant to the terms of the agreements incorporated in Court Exhibits 1, 3 and 4.

The Officers, directors and stockholders of plaintiff corporations and all other persons acting for or in their behalf will forthwith: a) turn over to defendant John McShain, Inc. all records, books, documents, contracts, and other assets of each plaintiff corporation and will perform whatever other acts are necessary to make possible the immediate management and control of the plaintiff corporation as are necessary to the exercise of all rights of the defendant John McShain, Inc. as they are defined by the exhibits above and determined by this Court; b) be restrained from interfering with the management and control by defendant John McShain, Inc. of plaintiff corporations and the exercise of rights defined by the agreements; c) be restrained from taking away, transfering, the disposing of or secreting of any assets of plaintiff corporations.

The relief described as accruing to the defendants in the prior four paragraphs of this opinion will be withheld in the event the plaintiffs pay to the defendant McShain corporation the amount of $1,-498,685.04 within five days of the filing of this opinion, and provided further that the plaintiffs also deliver to the defendant corporation at that time a note in the amount of $423,425.62, payable in installments of $166,666, the first payment to be due thereupon on May 22, 1957 and additional payments to be due in the amount of $166,666 each six months until the note is paid, in accord with the provisions of paragraph 5 of the Master Agreement.

The Court's use of the plural form in referring to defendants does not in any way enlarge the rights or obligations of these defendants beyond those established by the contracts and agreements. The word "defendants" is to be construed as referring either to the defendant John McShain, Inc. or to the defendant George Shea, or both, as the testimony, documents and the opinion define their status in each situation.

The cost of this action will be assessed against the plaintiffs.

Counsel will promptly submit an appropriate order carrying out the findings in this opinion.

### Court Exhibit No. 1.

This Agreement made as of the 18th day of December 1953, by and between John McShain, Inc. (McShain), a Delaware Corporation, having its office and

principal place of business at 540 North 17th Street, Philadelphia, Pennsylvania, and Arlington Towers Land Corporation (Land Corporation), and Walter P. Mc-Farland, Edward Johnson, William J. Kress, and John Loughran (Parties of the Second Part)

Witnesseth That

Whereas, Land Corporation has become owner in fee of certain parcels of land in Arlington, Virginia, said land being bounded by Arlington Ridge Road, Wilson Boulevard, North Street and Lee Boulevard, as shown more clearly upon a Survey Map prepared by Cecil M. DeLashmutt, dated June, 1951, and captioned "Arlington Towers Project," and to enable Land Corporation to so become owner in fee of these parcels of land. McShain has posted two bonds, one with the First National Bank of Alexandria, Virginia, in the amount of Five Hundred and Five Thousand ($505,000) Dollars, and another with the Hamilton National Bank, Washington, D. C. in the amount of Two Hundred Twenty-Seven Thousand ($227,000) Dollars, copies of which bonds are attached hereto and made a part hereof; and

Whereas, Land Corporation has secured a commitment for a mortgage loan in the amount of Two Million One Hundred Fifteen Thousand Six Hundred Twenty ($2,115,620) Dollars from Teachers Insurance and Annuity Association of America, 522 Fifth Avenue, New York, New York (Mortgage Loan) and disbursement of said loan to the Land Corporation will be made in part, to the extent of Seven Hundred Thirty-Two Thousand ($732,000) Dollars to satisfy the presently existing liens upon the land; and

Whereas, Land Corporation intends to erect four apartment buildings with appurtenant commercial installations all to be known as "Arlington Towers Project," and McShain has been awarded the construction contract for the erection of said buildings; and

Whereas, to effectuate the construction of these buildings, the officers and stockholders of Land Corporation have formed or will cause to be formed four (4) corporations to be known as the First Arlington Towers Corporation, Second Arlington Towers Corporation, Third Arlington Towers Corporation and Fourth Arlington Towers Corporation (Lessee Corporations), and each of such corporations has or will enter into a ninety-nine year lease with Land Corporation, said lease to be prior to any presently existing encumbrances or lien upon the premises; and

Whereas, each of such Lessee Corporations has or will request Chemical Bank and Trust Company, a New York banking institution to make an F. H. A. insured Mortgage loan to it in the principal amounts as indicated upon the attached exhibit captioned "Four Projects—Arlington Towers Corporation," which exhibit is made a part hereof by reference thereto, and Chemical has issued its commitment to the stockholders and officers of Land Corporation to so make such mortgage loans, and also to extend to each Lessee Corporation the amount of "Over and Above Loan" as indicated upon the aforementioned exhibit; and

Whereas, McShain and John McShain, individual, have by written documents, guaranteed to Chemical the repayment of the various loans captioned "Over and Above Loan," and have also become an accommodation endorser on a note in the amount of Two Hundred Twenty Thousand Dollars ($220,000) the proceeds of which are to be used for the payment of architect's fees in connection with the project.

Now, Therefore, in consideration of the mutual premises herein contained and other valuable consideration, receipt of which by each of the parties hereto is acknowledged, the parties respectively agree and represent as follows:

1. McShain shall furnish all the material and perform all of the work upon the property of Land Corporation req-

uisite for the erection of the complete Arlington Towers Project as indicated upon the drawings and specifications identified as follows:

Project Number 4: Drawings and Specifications under which Four Arlington Towers Corporation will erect said project and upon which Federal Housing Administration issued its commitment under F. H. A. Project No. 000–00085.

Project Number 3: Drawings and Specifications under which Third Arlington Towers Corporation will erect said project and upon which Federal Housing Administration issued its commitment under F. H. A. Project No. 000–00084.

Project Number 2: Drawings and Specifications under which Second Arlington Towers Corporation will erect said project and upon which Federal Housing Administration issued its commitment under F. H. A. Project No. 000–00083.

Project Number 1: Drawings and Specifications under which First Arlington Towers Corporation will erect said project and upon which Federal Housing Administration issued its commitment under F. H. A. Project No. 000–00083.

2. In order to facilitate construction and comply with the requirements of the Federal Housing Administration and Chemical, McShain agrees to enter into separate contracts with each of the Lessee Corporations above listed (copies of which Contracts will be annexed hereto and made a part hereof as and when executed), for the erection of each unit for the consideration indicated under "Construction Contract" on the Exhibit attached hereto captioned "Four Projects—Arlington Towers Corporation." It is the intent of the parties hereto, however, that McShain shall be the sole general contractor for the erection of the entire project, and the construction of this project shall be considered for the purpose of this Master Contract as a single unit.

3. McShain agrees to erect the project upon the following terms and conditions, all said terms and conditions being acceptable to the Land Corporation and its officers and stockholders set forth above.

4. McShain shall receive Seventeen Million Dollars ($17,000,000) as the lump sum contract price.

5. McShain, in addition to the contract price, shall receive One Million Dollars ($1,000,000) as agreed upon profit for its performance in constructing the Project. McShain agrees to accept upon completion of the project, a thirty-six month note of Land Corporation, payable in equal installments as follows:

$166,666 payable seven months after date.

$166,666 payable one year after date.

$166,666 payable eighteen months after date.

$166,666 payable two years after date.

$166,666 payable thirty months after date.

$166,670 payable three years after date.

Interest shall begin to run at six percent (6%) when any installment is one (1) week past due.

6. It is recognized by the parties hereto that the construction funds available from Chemical may not be sufficient to meet the overall contract price of $17,000,000 in that reserves retained by Chemical for carrying charges to meet taxes, insurance, F. H. A. Mortgage Insurance Premiums and interest during construction are to be applied against the overall commitment of Chemical. If McShain, through its separate construction contracts with the Lessee Corporations or otherwise is not reimbursed to the full amount of $17,000,000 for its construction costs, and which sum has been agreed upon by all the parties hereto as the construction costs, then, in that event, McShain shall have the right and privilege of becoming owner of the stock in accordance with the terms of the Escrow Agreement hereinafter referred to, and to take whatever steps may be necessary in the discretion of McShain to

protect its investment and/or realize the full contract price.

7. It is further agreed that if McShain or John McShain shall be called upon to pay any moneys by virtue of the bonds placed for the purchase of the land or the note for the payment of the architect's fees or the guaranty of the "Over and Above Loan," McShain shall have the right and privilege of becoming owner of the stock in accordance with the terms of the Escrow Agreement hereinafter referred to, and to take whatever steps may be necessary in the discretion of McShain to protect its investment and/or realize and recover the moneys so expended.

8. Land Corporation and the individuals above named agree to save McShain harmless in the manner above referred to and in order to effectuate the intention of the parties hereto represent and agree as follows:

(a) Land Corporation is a Virginia Corporation, having the following officers and stockholders: Walter P. McFarland, President, 50% stock interest

Edward Johnson, Treasurer, 25% stock interest

William J. Kress, Secretary

John Loughran, no office, 25% stock interest

(b) The above-mentioned officers and stockholders will form the four Lessee Corporations above-mentioned, and all the stock of the Lessee Corporations shall be owned by the parent company, Land Corporation, and each corporation shall have the same officers and directors as the parent company.

(c) Each of the Lessee Corporations shall enter into a construction contract with McShain for the erection of an apartment building, according to the plans and specifications referred to therein. Each of the Lessee Corporations shall irrevocably direct Chemical to issue all checks representing advances of loans, except first advance, and escrow funds directly to McShain or to joint order of McShain and Lessee Corporation, which corporation will authorize, by letter, McShain's representative to endorse and deliver in its behalf all of such checks.

(d) Each of the Lessee Corporations will also enter into an agreement with McShain, as collateral security for the undertaking by McShain of the guaranty of repayment of the "Over and Above Loan" each received from Chemical in aid of construction to assign to McShain the right to collect all the net profit from the operation of its individual buildings until such time as McShain has been reimbursed for any moneys required to be paid under McShain's guaranty with Chemical, and until McShain has realized his full construction costs, subject to prior rights of the Lender and the F. H. A.

(e) Land Corporation and the individuals named herein agree that it and they as officers and directors of the Lessee Corporations will assign and transfer over to McShain any moneys in the treasury of any of the Corporations, or on deposit to it on their account so long as any outstanding obligation to McShain under the guaranty with Chemical, the bonds posted with the Bank or the note endorsed by McShain for the payment of architect fees remains unpaid by the Land Corporation or any of the Lessee Corporations.

(f) Land Corporation will enter into an agreement with McShain wherein a representative chosen by McShain shall be designated Escrow Agent for the deposit by Land Corporation of the following items:

(i) All the stock of Land Corporation endorsed in blank by the holders thereof.

(ii) Stock Books, Minute Book and Seal of the Land Corporation.

(iii) All of the stock of all of the Lessee Corporations endorsed in blank.

(iv) Stock books, Minute Book and Seal of each of Lessee Corporations.

(v) Undated resignations of all of the directors and officers of Land Corporation.

(vi) Undated resignations of all of the directors and officers of Lessee Corporations.

The purpose of these provisions is to insure McShain security in its undertaking and to permit it to assume control of the Land Corporation and the Lessee Corporations if any or all of them default in their obligations undertaken by this agreement and the separate construction contracts.

9. Arlington and the individuals named herein covenant and agree that it and they will, with due diligence, prosecute to formation each of the Lessee Corporations, procure all necessary commitments for the erection of the buildings, and process to completion the entire contract contemplated by this agreement, and if, for any reason whatsoever, except causes arising out of the negligence of McShain, all contracts, commitments and other documents requisite to the erection of the complete project are not executed, McShain shall have the right and privilege of considering this agreement as breached, and McShain shall have the right to become owner of the stock in accordance with the terms of the Escrow Agreement and take whatever steps which may be necessary in the discretion of McShain, to protect its investment, and, if necessary, prosecute the work to completion in order to realize the full contract price of $17,000,000.

10. It is agreed between the parties hereto that the interpretation and enforcement of this agreement shall be in conformity with the laws of the Commonwealth of Pennsylvania, and time is of the essence.

In Witness Whereof, the parties hereto have caused their corporate names to be hereunto subscribed by their respective Presidents, duly attested corporate seals to be hereunto affixed by their respective Secretaries, and the individuals have hereunto set their hands and seals, all as of the day and year first above written.

Attest:
(seal)  /s/ Edward S. Barnhart
        _____
             Secretary

Attest:
(seal)  /s/ William J. Kress
        _____
             Secretary

/s/ Lester J. Tanner
_____
        Witness

/s/ Lester J. Tanner
_____
        Witness

/s/ Lester J. Tanner
_____
        Witness

/s/ Lester J. Tanner
_____
        Witness

John McShain, Inc.
By:   /s/ John McShain
      _____
           President

Arlington Towers Land Corporation
By:  /s/ Walter P. McFarland
     _____
           President

/s/ Walter P. McFarland
_____
    Walter P. McFarland

/s/ John Loughran
_____
    John Loughran

/s/ Edward Johnson
_____
    Edward Johnson

/s/ William J. Kress
_____
    William J. Kress

Court Exhibit No. 2.

December 21, 1953

John McShain, Inc.
540–North 17th Street
Philadelphia, Pa.

Gentlemen:

Reference is made to the contract entered into between you and the undersigned of even date herewith (herein referred to as the "Master Contract"). It is agreed between us that all four Lessee Corporations shall be formed and all four construction contracts between you and said lessee corporations shall be executed within sixty (60) days from the date hereof. A failure to comply with this provision shall entitle you to consider the Master Contract as breached, and you may elect to exercise your rights under the Escrow Agreement.

(seal)

Attest:

/s/ William J. Kress

Very truly yours,

Arlington Towers Land Corporation

By: /s/ Walter P. McFarland
_____
President

/s/ Walter P. McFarland
_____
Walter P. McFarland

/s/ Edward P. Johnson
_____
Edward P. Johnson

'/s/ John Loughran
_____
John Loughran

/s/ William J. Kress
_____
William J. Kress

Court Exhibit No. 3.

This Agreement made this 18th day of December, 1953, by and between John McShain, Inc., a Delaware corporation, 540 North Seventeenth Street, Philadelphia, Pennsylvania, (Contractor) and Arlington Towers Land Corporation (Arlington) a Virginia corporation.

Witnesseth

Whereas, Contractor and Arlington have entered into an agreement (Master Contract), dated the 18th day of December, 1953, whereby Contractor has agreed to erect a group of buildings to be known as "Arlington Towers Project" for a price and on the terms and conditions as therein set forth, and

Whereas, Contractor has undertaken to become surety of the United States Fidelity and Guaranty Company on the bonds posted with banks as indicated in the Master Agreement for a total of Seven Hundred and Thirty-Two Thousand Dollars ($732,000.00) to enable Arlington to secure the land upon which the buildings are to be erected, and

Whereas, Contractor has or will enter into individual construction contracts with four lessee corporations, all as more specifically set forth in the Master Contract, and

Whereas, Contractor has or will execute guaranties of repayment for the loan of an aggregate sum of Three Million Seven Hundred Thousand Ninety Seven Dollars ($3,700,097.00) by Chemical Bank and Trust Company to the four lessee corporations in aid of construction, and

Whereas, McShain has become an accommodation endorser of a note in the amount of Two Hundred Twenty Thousand Dollars ($220,000.00) which Arlington executed for the securing of sufficient funds to defray Architect charges.

Now, Therefore, each of the parties hereto, intending to be legally bound, agree

1. As collateral security for undertaking the work of construction and for undertaking the guaranties of repayment of loans aggregating Three Million Seven Hundred Thousand Ninety Seven Dollars ($3,700,097.00) for undertaking to become surety on the bonds, and for undertaking to become an accommodation endorser on the note, Arlington shall deposit with the Escrow Agent, hereinafter named, immediately following the execution of this agreement, certificates evidencing all the authorized and issued capital stock of Arlington, endorsed in blank, together with appropriate undated resignations of all of the officers and directors of the corporation.

2. Upon repayment to the Contractor of the total amount of the Construction Cost, to wit, $17,000,000, and the reimbursement of any moneys Contractor was compelled to expend by virtue of its liability on the guaranties, bonds or note, the said certificates of stock, together with the resignations of the officers and directors shall be forthwith returned by the Escrow Agent to Arlington.

3. If, Arlington fails to make payment of the full construction costs within a period of ten (10) days after completion of the project as set forth in the Master Contract or fails to reimburse Contractor for any moneys expended by virtue of the undertakings of Contractor within a period of ten (10) days after demand, the Escrow Agent, upon the request of Contractor, shall forthwith deliver the certificates of stock and the resignations of the officers and directors to the Contractor for such purposes as Contractor may deem necessary to effect the collection and recovery of the balance of the Construction Costs outstanding and unpaid, and the collection and recovery of any moneys expended by virtue of the guaranties, bonds and note.

4. Arlington covenants and agrees that it will, with due diligence prosecute to formation each of the Lessee Corporations referred to in the Master Agreement, procure all necessary commitments for the erection of the buildings and process to completion the entire contract contemplated by the Master Agreement, and, if for any reason whatsoever, except causes arising out of the negligence of McShain, all contracts, commitments and other documents requisite to the erection of the complete project are not executed, the Escrow Agent shall forthwith deliver the certificates of stock and the resignations of the officers and directors to the Contractor for such purposes as Contractor may deem necessary to effect the execution of all the agreements relative to the project to the end that the construction of the entire project be completed.

5. The Minute Books and Seal of the Corporation shall remain in the custody of George F. Shea, Esq., Washington, D. C. If it becomes necessary for the Escrow Agent to deliver the certificates of stock and the resignations of the officers and directors to the Contractor in conformity with the provisions of Paragraphs 3 and 4 above, Arlington consents and hereby authorizes George F. Shea, Esq. to deliver the Minute Books and Seal to the Contractor.

6. The Escrow Agent under the terms of this agreement will be Pennsylvania Company for Banking and Trusts, Philadelphia, Pennsylvania.

7. This Agreement shall inure to and be legally binding upon the parties hereto, their respective successors and assigns, provided however, that this agreement may not be assigned by either party without the written consent of the other.

In Witness Whereof, the parties hereto have caused, their corporate names to be hereunto subscribed by their respective presidents and their duly attested corporate seals to be hereunto affixed by their respective secretaries, the day and year first above written.

Attest:
/s/ Edward S. Barnhart
Secretary

John McShain, Inc.
By  /s/ John McShain
President

Attest:
/s/ William J. Kress

Arlington Towers Land Corporation
By  /s/ Walter P. McFarland
President

## Court Exhibit No. 4.

### Agreement.

This Agreement made as of this 28th day of April, 1954, by and between John McShain, Inc. (McShain), a Delaware corporation having its office and principal place of business at 540 North 17th Street, Philadelphia, Pennsylvania, and Arlington Towers Land Corporation (Land Corporation), and Walter P. McFarland, Edward Johnson, William J. Kress and John Loughran (Parties of the Second Part)

Witnesseth That:

Whereas, Land Corporation and Parties of the Second Part, jointly and severally, have entered into an agreement dated December 18, 1953, with McShain, wherein McShain has agreed to erect a Project to be known as "Arlington Towers Project" for a contract price of Seventeen Million ($17,000,000) Dollars plus additional consideration of One Million ($1,000,000) Dollars as agreed upon profit, the details for payment of said sums as more specifically spelled out in said Agreement; and

Whereas, under said contract certain rights and privileges vest in McShain upon the happening of certain stated events; and

Whereas, without limiting the foregoing, the Agreement recognizes the construction funds available may not be sufficient to meet the overall contract price of $17,000,000, and because of that McShain has certain rights and privileges expressed in the Agreement; and

Whereas, the Plans and Specifications made a part of the Master Agreement included the specifications for the erection of a commercial structure designated "C" Building in Project Number Two of the Arlington Towers Project, and said building has been removed from the final plans for construction; and

Whereas, the tabulation of the financing arrangement which was made a part of the Master Agreement and captioned "Four Projects—Arlington Towers Corporation" sets forth construction contracts totalling $16,427,806.50, and said amount was represented to McShain by the Land Corporation and the Parties of the Second Part as not subject to substantial change; and

Whereas, by changed financing arrangements resulting from the agreed deletion of "C" Building from the plans and Specifications, the total construction contracts will not total $15,745,691.-50, which produces an increase in the deficiency as represented by Land Corporation and the Parties of the Second Part; and

Whereas, because of such increased deficiency and other reasons the Master Agreement has been breached by Land Corporation and the Parties of the Second Part, and McShain now has the power to invoke all the privileges and rights given him by law and/or under the Master Agreement;

Now, Therefore, In consideration of One Dollar ($1.00) in hand paid, and other good and valuable consideration

exchanged mutual receipt of which is hereby acknowledged, and the mutual covenants herein, the Parties hereto agree as follows:

(1) The construction of "C" Building in Project Number Two is hereby eliminated from the Master Contract; McShain will process the construction of Arlington Towers Project to completion according to the plans and Specifications that are referred to and identified in the Master Contract, excluding the construction of "C" Building, for the contract price of $17,000,000 as set forth in the Master Contract.

Said contract price of $17,000,000 shall be paid to McShain as follows:

(a) McShain and the Lessee Corporations have entered into contracts totalling $15,745,691.50 for the construction of Arlington Towers Project.

(b) McShain shall receive a note of the Arlington Towers Land Corporation in the amount of Two Hundred Seventy-Five Thousand ($275,000) Dollars, maturing in eighteen (18) months from date, supported by a Deed of Trust upon the land of Arlington Towers Land Corporation. This land is the parcel upon which "C" Building was to have been constructed, but which upon payment of the presently existing notes supported by a Deed of Trust held by the First National Bank of Alexandria, Virginia, will be free and clear of any lien or encumbrance except the Deed of Trust gives McShain as collateral security for the note.

(c) McShain shall receive a note of the Arlington Towers Land Corporation in the amount of Four Hundred and Fifty Thousand ($450,000) Dollars. This note shall mature at the expiration of six (6) months from the completion of the project, and shall be payable in equal monthly installments, the first installment being due and payable one month after completion of the Project. Interest at six percent (6%) shall begin to run if and when the note is not paid at maturity. McShain is hereby authorized to insert the date of completion of the Project on the note delivered to it in performance of Land Corporation's obligation to deliver said note. Said note shall be executed and delivered to McShain promptly upon its demand.

In the event of the failure of Land Corporation to pay to McShain any installment when due, McShain, in such event, shall have the right and privilege of becoming owner of the stock of Land Corporation and to take whatever steps may be necessary in the discretion of McShain to protect its investment and/or realize the full contract price.

The waiver by McShain of its rights and privileges on any one installment shall not constitute or be construed as a waiver of its rights and privileges in respect of any other installment.

Land Corporation shall submit to McShain monthly, a statement by a certified Public Accountant of the affairs of the Land Corporation and its lessee subsidiaries, said monthly statements to begin one month after completion of the project. McShain or its agents shall have the right and privilege after completion of the project, and until it has been paid the full contract price of $17,-000,000, to examine and inspect all of the books and records of Land Corporation and its subsidiaries.

(d) The balance of the amount required to pay McShain its contract price, to wit, $529,308.50, shall be paid upon the completion of construction by the other parties to the Master Agreement.

(2) Except to the extent the Master Contract is supplemented or modified by the terms of this Agreement, each term, condition and provision of the Master Contract shall remain in full force and effect.

In Witness Whereof, the parties hereto have caused their corporate names to be hereunto subscribed by their respective Presidents, duly attested corporate seals to be hereunto affixed by their re-

spective Secretaries, and the individuals have hereunto set their hands and seals, all as of the day and year first above written.

Attest:

Edward S. Barnhart
———————————————
Secretary

John McShain, Inc.

John McShain
———————————————
President

Attest:

William J. Kress
———————————————
Secretary

Arlington Towers Land Corporation

By   Walter P. McFarland
———————————————
President

Charles S. Sourine
———————————————
Witness

Walter P. McFarland        (seal)
———————————————
Walter P. McFarland

Charles S. Sourine
———————————————
Witness

John Loughran        (seal)
———————————————
John Loughran

Charles S. Sourine
———————————————
Witness

Edward Johnson        (seal)
———————————————
Edward Johnson

A. Grunberg
———————————————
Witness

William J. Kress        (seal)
———————————————
William J. Kress

Court Exhibit No. 5.

In the United States District Court
for the District of Columbia

Arlington Towers Land Corporation, et al.

Plaintiffs

v.

John McShain, Inc., et. al.,

Defendants

Civil Action No. 2797–55

Stipulation of Counsel Respecting
Appointment and Duties of
Arbitrator

It is hereby expressly stipulated and agreed between the parties Plaintiff and parties Defendant by their counsel, as follows:

1. Edward G. Scharf, of 3809 Blackthorne Street, Chevy Chase, Maryland, is hereby designated and appointed as Arbitrator with the rights and powers hereinafter specified to hear and determine certain of the issues in the above entitled action, to wit:

The fair and reasonable value of credits and debits resulting from changes during the course of construction, by altering, adding to or deducting from the work described in the plans and specifications approved by F.H.A. on which construction was started in F.H.A. Project Nos. 000,000–85; 000,000–84; 000,-000–83; and 000,000–82 respectively known as Arlington Towers. In no event shall the Arbitrator determine any issue regarding Building C referred to in the Complaint.

2. The parties will promptly submit to the Arbitrator at a time and place to be designated by him all of the documents, statistics, data, evidence and proof (hereinafter collectively referred as "proof") to be offered by each of them.

3. The Arbitrator shall have the right and power to require the parties to submit such additional proof to be offered by the respective parties as he, in his sole discretion, may think necessary and appropriate and the parties agree to comply with any such requirement of the Arbitrator within forty-eight (48) hours from the time of receiving notice of such requirement unless the Arbitrator upon good cause shown shall extend said period of time for compliance.

4. The respective parties shall have the right to bring before the Arbitrator for his examination any sub-contractor who performed work on the matter to be considered by the Arbitrator and also any proof which any of these subcontractors may have. Nothing herein proved shall prevent the Arbitrator from personally inspecting the work, on notice to the parties.

5. The Arbitrator in determining the value of the work, labor and material shall base such determination on the respective values prevailing at the time when the contracts or orders for such work, labor and materials were given out.

6. The Arbitrator shall have the right and power to fix a final date on which the respective parties must submit all of their proof in addition to that theretofore submitted in accordance with this stipulation. The respective parties shall then have a period of 5 working days excluding Saturday during which they shall have the right to examine the proof submitted by the other party and to submit·contravailing proof. At the end of said period of 5 working days no further proof of any kind shall be received or considered by the Arbitrator.

7. As promptly as possible after the final submission of all proof to the Arbitrator, the Arbitrator shall render in writing his award based upon his findings on the issues herein. It is understood that time is of the essence in the completion of this proceeding and the parties join in urging the Arbitrator to expend every effort to render a speedy determination thereon.

8. It is contemplated and agreed by the parties that the Arbitrator shall have such additional power and authority as is vested in any Arbitrator appointed under or pursuant to Title 9 U.S.C.A. including without limitation the right to summon witnesses, cause the production of any material, book, record, document or paper, and to take all other steps necessary to cause the arbitration to proceed without undue delay.

9. The compensation of the Arbitrator is hereby fixed at $125 per day, it being agreed, however, that the maximum compensation shall not exceed $3,000. Such compensation shall be divided equally between the parties and shall be paid forthwith upon the completion of the proceeding, and the Arbitrator shall similarly be reimbursed for all reasonable and necessary actual out-of-pocket disbursements. The respective parties shall be billed by the Arbitrator separately and neither shall be liable for the amount owed by the other party.

10. The award of the Arbitrator with respect to the issues submitted to him shall be final and binding upon the parties hereto and such award may be introduced in evidence by any of the parties in this case and shall be conclusive as to the issues passed upon by the Arbitrator. Neither party will contest such findings. Neither party will appeal from such portion of any final judgment rendered in this case as gives expression to the award of the Arbitrator.

11. It is agreed by the respective parties that in entering into this stipulation the respective parties do not concede or waive their rights as a matter of law to claim or resist payment in full of the total of the "Contract Sums" amounting to $15,745,691.50 which appear in the four contracts between First, Second, Third and Fourth Arlington Towers Corporations and Defendant John McShain, Inc.